Lea F. Alvo-Sadiky, Attorney (ID PA #92738)
Attorney for Petitioner
National Labor Relations Board
The Wanamaker Building
100 Penn Square East, Suite 403
Philadelphia, Pennsylvania 19107
Phone: (215) 597-7630
Email: Lea.Alvo-Sadiky@nlrb.gov

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KIMBERLY E. ANDREWS, Regional Director of the Fourth Region of the NATIONAL LABOR RELATIONS BOARD, for and on behalf of the NATIONAL LABOR RELATIONS BOARD, <br><br> Petitioner, <br><br> v. <br><br> NEW VITAE, INC. d/b/a NEW VITAE WELLNESS AND RECOVERY. <br><br> Respondent | Civil No.   2:25-cv-04515 |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF PETITION FOR INJUNCTION
## UNDER SECTION 10(j) OF THE NATIONAL LABOR RELATIONS ACT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................II

I.    SUMMARY OF ARGUMENT ................................................................. 1

II.   PROCEDURAL POSTURE .................................................................... 2

III.  LEGAL STANDARDS FOR SECTION 10(J) INJUNCTIVE RELIEF .............. 4

    *A.  Likelihood of Success on the Merits* ................................................ 5
    *A.  Likelihood of Irreparable Harm Absent Interim Relief* ..................... 6
    *B.  Whether The Balance of Equities Favors Interim Relief* .................... 6
    *D. Whether Interim Relief is in the Public Interest* ............................... 7

IV.   SUMMARY OF FACTS ........................................................................ 7

    *A.  Overview of Respondent's operations* ............................................. 8
    *B.  Organizing Drive & Election* ......................................................... 8
    *C.  Respondent Suspends Lead Union Activist Danita Alexander Soon After She Makes Protected Concerted Complaints* ...................................................... 10
    *D. Respondent Threatens Discipline and Instructs Lead Union Activist Danita Alexander to Not Discuss Her Complaints with Other Employees* .............................. 12
    *E.  Respondent Retaliates Against Alexander Because of Her Union and Protected Concerted Activities by Reducing Her Hours, Giving a Negative Evaluation, and Discharging Her* ........ 13
    *F.  The Union Requests Bargaining and Information* ............................... 18
    *G.  The Parties Start Bargaining and Respondent Decides to Layoff the Bargaining Unit and Subcontract the Work to Agency Nurses Without Notifying and Bargaining with the Union* ... 21
    *H.  At the November 1, 2024 Bargaining Session Respondent Announces the Layoff of the Bargaining Unit and Subcontracts Out the Work* .................................... 24

V.    ARGUMENT ..................................................................................... 29

    *A.  Petitioner Has Shown a Strong Likelihood of Success on the Merits* ............... 29

        *1.  Petitioner Has a Likelihood of Success of Showing that Respondent Unlawfully Subcontracted Out and Laid Off the Entire Bargaining Unit Without Notifying and Bargaining with the Union, in Violation of Section 8(a)(5) of the Act.* ............... 30

        *2.  Petitioner Has a Likelihood of Success of Showing that Respondent Unlawfully Subcontracted Out and Laid Off the Entire Bargaining Unit in Violation of Section 8(a)(3) of the Act* .............................................................................. 35

    *B.  Interim Relief is Needed to Prevent Irreparable Harm to Employees' Rights under Section 7 of the Act and Protect the Board's Remedial Power* ........................... 40
    *C.  The Balance of Equities Strongly Favors Temporary Injunctive Relief* ............ 48
    *D. Temporary Injunctive Relief Here Serves the Public Interest* ..................... 49

VI.   CONCLUSION ................................................................................... 51

# TABLE OF AUTHORITIES

Page(s)

Cases

*Absolute Healthcare d/b/a Curaleaf Arizona*,
 372 NLRB No. 16 (2022), enfd. in part and remanded, 26 F.4th 1002 (D.C. Cir. 2022)... 38, 39
*Aero Metal Forms, Inc.*,
 310 NLRB 397 fn. 14 (1993) ............................................................................................ 37
*AFSCME Local 5*,
 364 NLRB 837 (2016) ...................................................................................................... 31
*Aguayo v. Tomco Carburetor Co.*,
 853 F.2d 744 (9th Cir. 1988), *overruled,  Miller v. Cal. Pac. Med. Ctr.*, 19 F.3d 449 (9th Cir.
 1994) (en banc) ................................................................................................... 42, 45, 49
*Amoco Prod. Co. v. Vill. of Gambell, Alaska*,
 480 U.S. 531 (1987)............................................................................................................ 7
*Angle v. Sacks*,
 382 F.2d 655 (10th Cir. 1967) ............................................................................. 43, 44, 47
*Arbah Hotel Corp. v. NLRB*,
 845 Fed. Appx. 181 (3d Cir. 2021).................................................................................... 34
*Arbah Hotel Corp.*,
 368 NLRB No. 119 (2019) ................................................................................................ 34
*Arlook v. S. Lichtenberg & Co., Inc.*,
 952 F.2d 367 (11th Cir. 1992) .......................................................................................... 46
*Asseo v. Centro Medico del Turabo, Inc.*,
 900 F.2d 445 (1st Cir. 1990).................................................................................... 45, 50
*Asseo v. Pan Am. Grain Co.*,
 805 F.2d 23 (1st Cir. 1986).................................................................................... 48, 49
*Bernstein v. Carter & Sons Freightways, Inc.*,
 983 F. Supp. 994 (D. Kan. 1997)...................................................................................... 41
*Bloedorn v. Francisco Foods, Inc.*,
 276 F.3d 270 (7th Cir. 2001) ............................................................................. 45, 47, 49
*BS&B Safety Systems, LLC*,
 370 NLRB No. 90, slip op. at 2 ................................................................................. 38, 39
*Chester v. Grane Healthcare Co.*,
 666 F.3d 87 (3d Cir. 2011)....................................................................... 4, 5, 41, 45, 47
*Ciba-Geigy Pharmaceuticals Division*,
 264 NLRB 1013 (1982), enfd. 722 F.2d 1120 (3d Cir. 1983) ................................... 31, 32
*Citizen Publ'g*,
 263 F.3d ..................................................................................................................... 35, 46
*CJC Holdings*,
 320 NLRB 1041 (1996), enfd., 110 F.3d 794 (5th Cir. 1997) .......................................... 37
*Clear Channel Outdoor, Inc.*,
 346 NLRB 696 (2006) ...................................................................................................... 31

*Coffman v. UPS Supply Chain Solutions*,
    2024 WL 36174 (E.D. Cal. Jan. 3, 2024) ........................................................... 47
*Consolidated Bus Transit, Inc.*,
    350 NLRB 1064 (2007), enfd. 577 F.3d 467 (2d Cir. 2009) ............................... 36
*D'Amico v. NLRB*,
    582 F.2d 820 (3rd Cir. 1978) ........................................................................... 43
*Dorsey Trailers, Inc., v. NLRB*,
    134 F.3d 125 (3d Cir. 1998) ............................................................................. 34
*Duffy Tool & Stamping, LLC v. NLRB*,
    233 F.3d 995 (7th Cir. 2000) ........................................................................... 45
*DuPont Specialty Products USA*,
    369 NLRB No. 117 (2020), enfd. 2021 WL 3579384 (3d Cir. Aug. 13, 2021) ............... 32, 47
*Eagle Material*,
    558 F.2d 160 (3d Cir. 1977) ....................................................................... 37, 39
*Eisenberg v. Hartz Mountain Corp.*,
    519 F.2d 138 (3d Cir. 1975) ............................................................................. 50
*Eisenberg v. Wellington Hall Nursing Home*,
    651 F.2d 902 (3d Cir. 1981) ............................................................... 44, 49, 50
*Electrical Prods. Div. of Midland-Ross Corp. v. NLRB*,
    617 F.2d 977 (3d Cir. 1980) ............................................................................. 37
*Electrolux Home Prod., Inc.*,
    368 NLRB No. 34 (2019) ................................................................................. 36
*Fall River Dyeing & Finishing Corp. v. NLRB*,
    482 U.S. 27 (1987) ........................................................................................... 46
*Fibreboard Paper Prods. Corp. v. NLRB*,
    379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964) ............................. 31, 34, 50
*Finch, Pruyn & Co.*,
    349 NLRB 270 (2007) ..................................................................................... 31
*Ford Motor Co. v. NLRB*,
    441 U.S. 488 (1979) ......................................................................................... 50
*Frankl v. HTH Corp.*,
    *(Frankl II)*, 693 F.3d 1051 (9th Cir. 2012) ..................................................... 47
*Frankl v. HTH Corp.*,
    650 F.3d 1334 (9th Cir. 2011) ................................................................. passim
*Franks Bros. Co. v. NLRB*,
    321 U.S. 702 (1944) ................................................................................... 42, 46
*Frye v. Specialty Envelope, Inc.*,
    10 F.3d 1221 (6th Cir. 1993) ........................................................................... 45
*Furniture Renters of Am., Inc. v. NLRB*,
    36 F.3d 1240 (3d Cir. 1994) ............................................................................. 34
*Gannett Co.*,
    333 NLRB 355 (2001) ..................................................................................... 32
*Garcia v. Sacramento Coca-Cola Bottling Co., Inc.*,
    733 F. Supp. 2d 1201 (E.D. Cal. 2010) ............................................................ 47
*Goonan v. Amerinox Processing, Inc.*,
    2021 WL 2948052 (D.N.J. July 14, 2021) ........................................................ 47

*Green Apple Supermarket of Jamaica, Inc.*,
  366 NLRB No. 124 (2018), 805 Fed.Appx. 65 (2d Cir. 2020)...................... 38
*Hirsch v. Dorsey Trailers, Inc.*,
  147 F.3d 243 (3d Cir. 1998)................................................................. passim
*Hoffman v. Inn Credible Caterers*,
  247 F.3d 360 (2d Cir. 2001)...................................................................... 4, 45
*Hooks v. Ozburn-Hessey Logistics, LLC*,
  775 F. Supp. 2d 1029 (W.D. Tenn. 2011)....................................................... 47
*Hubbel v. Patrish, LLC*,
  903 F. Supp. 2d 813 (E.D. Mo. 2012)........................................................... 41
*Hunter Douglas, Inc. v. NLRB*,
  804 F.2d 808 (3d Cir. 1986)...................................................................... 37
*Inter-Disciplinary Advantage, Inc.*,
  349 NLRB 480 (2007) .............................................................................. 38
*Intertape Polymer Corp.*,
  372 NLRB No. 133 (2023), enfd. 2024 WL 2764160 (6th Cir. 2024) .............................. 36, 39
*J Container Systems, Inc. d/b/a T&J Trucking Co.*,
  316 NLRB 771 fn. 9 (1995)........................................................................ 37
*Kaynard v. Palby Lingerie, Inc.*,
  625 F.2d 1047 (2d Cir. 1980)............................................................. 44, 48, 49
*Kendellen v. Evergreen Am. Corp.*,
  428 F. Supp. 2d 243 (D.N.J. 2006) .............................................................. 48
*Kobell v. Suburban Lines, Inc.*,
  731 F.2d 1076 (3d Cir. 1984)...................................................................... 5
*Kobell v. Thorsen Tool Co.*,
  1982 WL 2093 (M.D. Pa. Dec. 29, 1982).......................................................... 43
*Kreisberg v. HealthBridge Management, LLC*,
  732 F.3d 131 (2d Cir. 2013)....................................................................... 2
*Lightner v. Dauman Pallet, Inc.*,
  823 F. Supp. 249 (D.N.J. 1992)................................................................... 44
*Lineback v. Spurlino Materials, LLC*,
  546 F.3d 491 (7th Cir. 2008)...................................................................... 46
*Lucky Cab Co.*,
  360 NLRB 271 (2014) .......................................................................... 36, 39
*Maram v. Universidad Interamericana de Puerto Rico, Inc.*,
  722 F.2d 953 (1st Cir. 1983), ............................................................. 41, 45, 49
*May Dep't Stores Co. v. NLRB*,
  326 U.S. 376 (1945).............................................................................. 46
*Mi Pueblo Foods*,
  360 NLRB 1097 (2014) ........................................................................... 33
*Midwest Terminals of Toledo Int'l*,
  365 NLRB 1680 (2017), enfd. 783 Fed. Appx. 1 (D.C. Cir. 2019)................................ 38
*Miller v. California Pacific Medical Ctr.*,
  19 F.3d 449 (9th Cir. 1994) ................................................................ 7, 42, 49
*Moore-Duncan v. Aldworth Co.*,
  124 F. Supp. 2d 268 (D.N.J. 2000) .............................................................. 45

*Moore-Duncan v. Horizon House Developmental Servs.*,
  155 F. Supp. 2d 390 (E.D. Pa. 2001) ..................................................... 45

*N.D. v. Haw. Dep't of Educ.*,
  600 F.3d 1104 (9th Cir. 2010) ............................................................ 51

*Naperville Ready Mix, Inc.*,
  329 NLRB 174 (1999), enfd. 242 F.3d 744 (7th Cir. 2001) .................... 31

*NCRNC, LLC d/b/a Northeast Center for Rehabilitation*,
  372 NLRB No. 35, slip op. at 1-2 ....................................................... 36

*New York Paving, Inc.*,
  370 NLRB No. 44 (2020) ................................................................... 31

*NLRB v. Atlas Microfilming, Div. of Sertafilm, Inc.*,
  753 F.2d 313 (3d Cir. 1985).............................................................. 43

*NLRB v. Broad St. Hosp. and Medical Center*,
  452 F.2d 302 (3d Cir. 1971)......................................................... 41, 42

*NLRB v. C & C Plywood Corp.*,
  385 U.S. 421 (1967) ......................................................................... 41

*NLRB v. Electro-Voice, Inc.*,
  83 F.3d 1559 (7th Cir. 1996) ....................................... 6, 42, 45, 49

*NLRB v. Jones & Laughlin Steel Corp.*,
  301 U.S. 1 (1937)............................................................................. 41

*NLRB v. Juniata Packing Co.*,
  464 F.2d 153 (3d Cir. 1972).............................................................. 43

*NLRB v. Katz*,
  369 U.S. 736 (1962).......................................................................... 35

*NLRB v. Transportation Management Corp.*,
  462 U.S. 393 (1983).......................................................................... 36

*NLRB v. United States Steel Corp. (Amer. Bridge Div.)*,
  278 F.2d 896 (3d Cir. 1960)............................................................... 50

*Norelli v. HTH Corp.*,
  699 F. Supp. 2d 1176 (D. Haw. 2010) ................................................. 47

*Nurses Assocs. of Cal. v. NLRB*,
  871 F.3d 767 (9th Cir. 2017) ........................................................ 40, 47

*O.G.S. Technologies, Inc.*,
  356 NLRB 642 (2011) .................................................................. 31, 33

*Overstreet v. David Saxe Prods., LLC*,
  2019 WL 332406 (D. Nev. Jan. 24, 2019)............................................ 47

*Overstreet v. Lucid USA, Inc.*,
  2024 WL 4186825 (D. Ariz. Sept. 13, 2024).......................................... 43

*Overstreet v. One Call Locators Ltd.*,
  46 F. Supp. 3d 918 (D. Ariz. 2014) ..................................................... 47

*Pascarell v. Gitano Group, Inc.*,
  730 F. Supp. 616 (D. N.J. 1990) .................................................. 42, 47, 48

*Pascarell v. Orit Corp./Sea Jet Trucking*,
  705 F. Supp. 200 (D.N.J. 1988) .......................................................... 42

*Pascarell v. Vibra Screw Inc.*,
  904 F.2d 874 (3d Cir. 1990).................................................. 5, 44, 46, 50

*Paulsen v. Remington Lodging & Hospitality, LLC*,
  773 F.3d 462 (2d Cir. 2014) ................................................................. 50
*Pontiac Osteopathic Hospital*,
  336 NLRB 1021 (2001) ........................................................................ 32
*Power, Inc.*,
  311 NLRB 599 (1993), enfd., 40 F.3d 409, 425 (D.C. Cir. 1994). ......................................... 49
*Pye v. Excel Case Ready*,
  238 F.3d 69 (1st Cir. 2001) .................................................. 42, 44, 45, 49
*Quickway Transportation, Inc.*,
  354 NLRB 560 (2009) .......................................................................... 31
*Radio Officers' Union v. NLRB*,
  347 U.S. 17 (1954) ............................................................................... 43
*Raytheon Network Centric Systems*,
  365 NLRB 1722 (2017) ........................................................................ 35
*Regal Cinemas, Inc.*,
  334 NLRB 304 (2001), enfd. 317 F.3d 300 (D.C. Cir. 2003) ...................... 31
*Reynolds v. Curley Printing Co.*,
  247 F. Supp. 317 (M.D. Tenn. 1965) ..................................................... 41
*Rieth-Riley Construction. Co., Inc.*,
  373 NLRB No. 149, slip op. at 1, 10  (2024) ........................................ 32
*Rigid Pak Corp.*,
  366 NLRB No. 137, slip op. at 4-5 (2018) ...................................... 31, 32
*Rock Valley Trucking Co.*,
  350 NLRB 69 (2007) ............................................................................ 36
*Rubin v. Vista del Sol Health Services, Inc.*,
  2015 WL 306292 (C.D. Cal. Jan. 22, 2015) .......................................... 47
*Sacks v. I.N.S.A., Inc.*,
  2024 WL 2187012 (D. Mass. May 14, 2024) ........................................ 47
*Schaub v. W. Mich. Plumbing & Heating, Inc.*,
  250 F.3d 962 (6th Cir. 2001) ................................................................ 44
*Scott v. Stephen Dunn & Assoc.*,
  241 F.3d 652 (9th Cir. 2001) ............................................................ 4, 6
*Seeler v. Trading Port, Inc.*,
  517 F.2d 33 (2d Cir. 1975) .............................................................. 48, 51
*Silverman v. Whittal & Shon, Inc.*,
  1986 WL 15735 (S.D.N.Y. June 6, 1986) .............................................. 44
*Small v. Avanti Health Systems, LLC*,
  661 F.3d 1180 (9th Cir. 2011) ...................................................... passim
*Sociedad Espanola de Auxilio Mutuo y Beneficencia de P.R.*,
  342 NLRB 458 (2004), enfd. 414 F.3d 158 (1st Cir. 2005) .................... 31
*Somerset and Valley Rehabilitation and Nursing Center*,
  362 NLRB 961 (2015), incorporating by reference 358 NLRB 1361, 1391-1392 (2012),  enfd.
  825 F.3d 128 (3rd Cir. 2016) ............................................................... 38
*St. George Warehouse, Inc.*,
  341 NLRB 904 (2004), enfd. 420 F.3d 294 (1st Cir. 1005)  ................... 31

*St. George Warehouse, Inc.,*
349 NLRB 870 (2007) ........................................................................... 38
*Starbucks Corp. v. McKinney,*
602 U.S. 339 (2024) ....................................................................... 4, 5, 7
*Sullivan v. Fairfield Parsippany, LLC,*
2025 WL 40086 (D.N.J. Jan. 7, 2025) ..................................... 43, 44, 48
*Torrington Industries, Inc.,*
307 NLRB 809 (1992) ......................................................................... 31
*Trader Joe's,*
373 NLRB No. 73, slip op. at 2 (2024) ............................................... 38
*Union-Tribune Publ'g Co.,*
307 NLRB 25 (1992), enfd. 1 F.3d 486 (7th Cir. 1993) ...................... 37
*Univ. of Tex. v. Camenisch,*
451 U.S. 390 (1981) .............................................................................. 6
*W.F. Bolin.,*
311 NLRB 1118 (1993), enfd. 99 F.3d 1139 (6th Cir. 1996) ............... 36
*Wendt Corp.,*
372 NLRB No. 135 (2023) ................................................................... 35
*Winter v. Natural Resources Defense Council, Inc.,*
555 U.S. 7 (2008) ......................................................................... 5, 6, 7
*Wright Line, Inc.,*
251 NLRB 1083 (1980), enfd. 662 F.2d 899 (1st Cir. 1981), cert. den. 455 U.S. 989 (1982). 36

## Statutes

29 U.S.C. §160(j) ................................................................................ 2, 4
29 U.S.C. § 151 ................................................................................ 40, 50
29 U.S.C. § 157 ...................................................................................... 41
29 U.S.C. § 158(a)(1), (3), and (5) ........................................................... 3

## Regulations

Order Contingently Delegating Authority to the General Counsel,
76 Fed. Reg. 69,768 (Nov. 9, 2011) ....................................................... 2

## I.    <u>**SUMMARY OF ARGUMENT**</u>

This case involves an employer's layoff of a newly certified bargaining unit and subcontracting of their work without notifying and bargaining with their union. Such actions send a clear message to all employees that union support will result in termination. Without an immediate injunction, New Vitae, Inc. d/b/a New Vitae Health and Wellness's (herein Respondent's), illegal actions will succeed in permanently thwarting the intent of Congress, the Board's remedial authority, and the employees' statutory right to organize and collectively bargain with their employer in an effort to improve their terms and conditions of employment. Petitioner is requesting that the Court direct Respondent to, on an interim basis, offer immediate reinstatement to 17 employees whom it laid off on November 1, 2024, and cease and desist from engaging in all coercive conduct that interferes with its employees' rights to form and join unions under Section 7 of the National Labor Relations Act (the Act).

Petitioner submits that Respondent engaged in a wide range of unlawful behavior, including coercive statements, discharging a lead union adherent, making unilateral changes, and refusing to bargain, culminating with the laying off of the entire bargaining unit when Respondent decided to subcontract the entirety of the bargaining unit work to two outside staffing agencies. Respondent engaged in this conduct to erode support for the Union during negotiations for an initial contract. Respondent's unlawful actions have had the intended effect of destroying any chance that employees will support a union now or in the future, or that they will engage in concerted activity to better their working conditions.  Petitioner seeks temporary injunctive relief in this case because, as explained below, there is considerable risk that the passage of time inherent in resolving this matter through the Board's statutory procedures will greatly undermine the effectiveness of the Board's final order, rendering it functionally moot. Respondent's unlawful

conduct in this case has decimated the cohesion of the bargaining unit at issue herein and has caused employee disaffection with the Union to such a degree that, absent injunctive relief, including an interim bargaining order and an order requiring Respondent to extend job offers to all the predecessor's former employees, Respondent will be able to achieve, through illegal means, its goal of permanently depriving employees of their right to Union representation and keeping its operation union free. Petitioner respectfully requests that the district court prevent such an unjust result and temporarily restrain Respondent from its unfair labor practices pending the final outcome of the Board case. Thus, Petitioner seeks an injunction that will return the employees in this case to the status quo as it existed prior to Respondent's unlawful conduct and compel Respondent to bargain in good faith with the Union, in addition to other appropriate relief.

## II.    PROCEDURAL POSTURE

This proceeding is before the Court on a Petition filed by the Regional Director of the Fourth Region of the National Labor Relations Board (Petitioner). Petitioner seeks temporary injunctive relief pending the Board's final disposition of this matter under Section 10(j) of the National Labor Relations Act.[1]   Section 10(j) permits the Board to seek temporary injunctive relief in a United States District Court in any case in which an administrative Complaint alleging the

---

[1] 61 Stat 149, 73 Stat 544, 29 U.S.C. §160(j). On July --, 2025, the Acting General Counsel authorized the institution of Section 10(j) proceedings in this case pursuant to the Board's November 2011, contingent delegation to the General Counsel of authority on all court litigation matters. *See* Order Contingently Delegating Authority to the General Counsel, 76 Fed. Reg. 69,768 (Nov. 9, 2011) (Board delegating to the General Counsel full authority over court litigation matters when the Board has fewer than three members); *see also Kreisberg v. HealthBridge Management, LLC*, 732 F.3d 131, 137-141 (2d Cir. 2013), *cert. denied* 135 S.Ct. 869 (2014) (General Counsel could seek Section 10(j) relief pursuant to Board's delegation of authority); *Frankl v. HTH Corp.*, 650 F.3d 1334, 1340, 1347-54 (9th Cir. 2011) (holding that General Counsel could seek Section 10(j) relief pursuant to Board's delegation of authority and collecting other circuit court cases finding the same).

commission of unfair labor practices has been issued and injunctive relief is necessary.[2]

On April 8, 2025, an Order Consolidating Cases, Consolidated Complaint and Notice of Hearing (Consolidated Complaint) issued in this matter alleging that Respondent has committed unfair labor practices within the meaning of Section 8(a)(1), (3), and (5) of the Act. 29 U.S.C. § 158(a)(1), (3), and (5).[3]

A hearing based on the Consolidated Complaint was conducted before Administrative Law Judge (ALJ) Paul A. Bogas on May 20 and 21, 2025. The parties in the administrative case have submitted post-hearing briefs to the ALJ on June 25, 2025. The ALJ will issue a written decision, making factual findings based on the extensive witness testimony and documentary evidence adduced at trial and recommending that the Board adopt a certain disposition in this case. The parties may then appeal any aspect of the ALJ's ultimate decision by filing exceptions with the Board, in which case the Board will, in turn, evaluate the exceptions and issue another written

---

[2] Section 10(j) provides:

> The Board shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any district court of the United States…within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order.  Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

The alleged unfair labor practices occurred within this judicial district.  Accordingly, this Court has jurisdiction.

[3] 29 U.S.C. Sec. 158 (a)(1), (3), and (5). Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain or coerce employees in the exercise of" their right to engage in, or refuse to engage in, concerted labor activity. Section 8(a)(3) prohibits employers from discriminating against employees "to encourage or discourage membership in any labor organization." Section 8(a)(5) of the Act makes it a violation of the Act for an employer "to refuse to bargain collectively with the representative of [its] employees."

decision and an order.[4] There is no prescribed time frame for decision at any stage in the administrative process. Thus, final disposition of an NLRB administrative proceeding may take years.

### III.    LEGAL STANDARDS FOR SECTION 10(j) INJUNCTIVE RELIEF

Section 10(j) of the Act,[5] authorizes federal district courts to grant temporary injunctions pending the Board's resolution of unfair labor practice proceedings. As the Supreme Court has stated, because "the Board's administrative proceedings take years, Congress vested the Board with authority to seek a preliminary injunction in federal court while the proceedings unfold" since in many instances, absent interim relief, a respondent could accomplish its unlawful objective before being placed under any legal restraint, thereby rendering a final Board order ineffectual.[6] Thus, Section 10(j) was intended to prevent the potential frustration or nullification of the Board's remedial authority caused by the passage of time inherent in Board administrative litigation. "The court must evaluate the traditional equitable criteria through the prism of the underlying purpose of Section 10(j), which is to protect the integrity of the collective bargaining process and to preserve the Board's remedial power."[7]

---

[4] Section 102.94 of the Board's Rules and Regulations.

[5] 29 U.S.C. § 160(j).

[6] *Starbucks Corp. v. McKinney*, 602 U.S. 339, 342 (2024). *See Chester v. Grane Healthcare Co.*, 666 F.3d 87, 92-93 (3d Cir. 2011) (citing S. Rep. No. 105, 80th Cong., 1st Sess., at pp. 8, 27 (1947), *reprinted at*, *I Legislative History of the Labor Management Relations Act of 1947* 414, 433 (Government Printing Office 1985)). *See also Hoffman v. Inn Credible Caterers*, 247 F.3d 360, 368 (2d Cir. 2001) ("[o]ne of the underlying purposes of [Section] 10(j) is to preserve the status quo in order to protect employees' statutory collective bargaining rights.").

[7] *Frankl*, 650 F.3d at 1355 (quoting *Scott v. Stephen Dunn & Assoc.*, 241 F.3d 652 (9th Cir. 2001), abrogated on other grounds as recognized by *Frankl*).

The Supreme Court recently held in *Starbucks Corp. v. McKinney*[8] that in considering a request for a temporary injunction under Section 10(j), the district courts must apply the traditional four-factor test set forth in in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). Therefore, the Board must establish: 1) a likelihood of success on the merits; 2) a likelihood of irreparable harm in the absence of preliminary relief; 3) a balance of equities in the Board's favor; and 4) that an injunction is in the public interest.[9]

### A.    *Likelihood of Success on the Merits*

Likelihood of success in a Section 10(j) proceeding is a function of the probability that the Board will issue an order determining that the unfair labor practices alleged by the Petitioner occurred and that the Circuit Court would grant a petition enforcing that order.[10] Therefore, in a Section 10(j) proceeding, the district court should sustain the petitioner's factual allegations if a showing has been made that the Board "is likely to succeed on the merits."[11] However, the petitioner need not prove by a preponderance of the evidence that the respondent committed the alleged unfair labor practices in question, nor must the petitioner demonstrate a certainty of

---

[8] 602 U.S. at 345.

[9] *Starbucks Corp.*, 602 U.S. at 345. The Fourth, Seventh, Eighth, and Ninth Circuits had used this four-factor test in determining whether to grant a 10(j) injunction. Id. Previously, to resolve a 10(j) petition, a district court in the Third Circuit considered only two issues: whether there is "reasonable cause to believe" that a respondent has violated the Act. *See, e.g., Chester v. Grane Healthcare Co.*, 666 F.3d at 100; *Hirsch v. Dorsey Trailers, Inc.*, 147 F.3d 243, 247 (3d Cir. 1998); *Pascarell v. Vibra Screw Inc.*, 904 F.2d 874, 877 (3d Cir. 1990); *Kobell v. Suburban Lines, Inc.*, 731 F.2d 1076, 1078 (3d Cir. 1984).

[10] *Frankl*, 650 F.3d at 1355; *see also Small v. Avanti Health Systems, LLC,* 661 F.3d 1180, 1187 (9th Cir. 2011).

[11] *Starbucks Corp.*, 602 U.S. at 345 (quoting *Winter*, 555 U.S. at 20, 22).

winning on the merits.[12]

### A.  Likelihood of Irreparable Harm Absent Interim Relief

Likely irreparable injury is established in a Section 10(j) case by showing "a present or impending deleterious effect of the likely unfair labor practice that would likely not be cured by later relief."[13] Petitioner can make the requisite showing of likely irreparable harm either through evidence that such harm is occurring,[14] or from "inferences from the nature of the particular unfair labor practice at issue [which] remain available."[15]

Continuing violations of Section 8(a)(5) of the Act involving the failure to bargain in good faith and Section 8(a)(3) violations involving the unlawful discharge of union supporters have "long been understood as likely causing an irreparable injury to union representation."[16] Even if the Board subsequently orders a bargaining remedy or reinstatement of the supporters, "the union is likely weakened in the interim, and it will be difficult to recreate the original status quo with the same relative position of the bargaining parties. That difficulty will increase as time goes on."[17]

### B.  Whether The Balance of Equities Favors Interim Relief

"In each case, courts 'must balance the competing claims of injury and must consider the

---

[12] *Scott*, 241 F.3d at 662; *NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1568 (7th Cir. 1996); *see also, Univ. of Tex. v. Camenisch*, 451 U.S. 390, 394 (1981) ("likelihood of success" does not equate to "success").

[13] *Frankl*, 650 F.3d at 1362. *See also Winter*, 555 U.S. at 22 (A preliminary injunction will not be issued simply to prevent the possibility of some remote future injury, but instead it must be demonstrated that the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered).

[14] *See, e.g., Scott,* 241 F.3d at 667-68.

[15] *Frankl,* 650 F.3d at 1362.

[16] *Id*. *See also Small*, 661 F.3d at 1191.

[17] *Frankl,* 650 F.3d at 1363.

effect on each party of the granting or withholding of the requested relief.'"[18] Courts must consider the matter in light of the underlying purpose of Section 10(j), which is "to protect the integrity of the collective bargaining process and to preserve the Board's remedial power while it processes the charge."[19] Therefore, in balancing the equities, district courts must take into account the probability that declining to issue an injunction will permit "an alleged unfair labor practice to reach fruition and thereby render meaningless the Board's remedial authority."[20]

### D. Whether Interim Relief is in the Public Interest

The public interest in a Section 10(j) case is to prevent remedial failure, ensuring that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge, while protecting employee rights.[21]

Petitioner respectfully submits that the facts of this case satisfy each prong of the above-described equitable criteria and establish that a temporary injunction is required here to protect the Union's and employees' statutory rights in the public interest and preserve the remedial authority of the Board.

## IV.    SUMMARY OF FACTS[22]

---

[18] *Winter*, 555 U.S. at 24 (*quoting Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 542 (1987)).

[19] *Miller v. California Pacific Medical Ctr.*, 19 F.3d 449, 461 (9th Cir. 1994) (en banc), abrogated on other grounds by *Winter*.

[20] *Starbucks Corp.*, 602 U.S. at 362 (Jackson, J., concurring in part) (citing *Frankl*, 650 F.3d at 1362). *See also Small*, 661 F.3d at 1191; *Miller*, 19 F.3d at 459-60.

[21] *Frankl*, 650 F.3d at 1365, *quoting Miller*, 19 F.3d at 460. *See also Small*, 661 F.3d at 1197.

[22] The following factual recitation is based on the testimonial and documentary evidence offered at the underlying administrative hearing, along with affidavit evidence to address the equitable need for the injunction.  Petitioner is also prepared to produce live witnesses should the Court so order.

### A. Overview of Respondent's operations

Respondent operates three residential treatment facilities for adults (RTFAs) located in South and West Philadelphia, which are Respondent's only unionized facilities. (T. 80, 218, 220-221, 223, 329)[23] The facilities house male residents who have been released from hospitals or prisons but require a step-down treatment facility. (T. 222-223, 332-333) The RTFAs are licensed by the Pennsylvania Department of Human Services and the Office of Mental Health and Substance Abuse Services. (T. 331-332) Respondent also operates non-unionized assisted living homes for individuals with behavioral health issues in the Lehigh Valley and Bucks County. (T. 80, 222-223)

Judith Yanacek is Respondent's President and CEO. Taliah Mason is the Assistant Administrator/Director of Wellness for the RTFAs. She reports to Samara Speakes, Administrator. (T. 218, 219) Mason, who has offices at both the South and West Philadelphia facilities, does the scheduling of nurses and was their direct supervisor. (T. 220, 230)

RTFAs are staffed with psychiatric nurses, LPNs, therapists, and mentors. (T. 221-222) The LPNs, therapists, and mentors are not represented by a union. (T. 222, 259) Mentors have direct care responsibility of residents, including taking them to appointments and activities. (T. 240-241) Psychiatric nurses administer medication, take vital signs, take notes, and educate residents and their families among other duties. (T. 28, 94)

### B. Organizing Drive & Election

---

[23] Factual citations are from the official administrative hearing record developed in Board Case No. 04-CA-324629 et al. "T. _" refers to the administrative hearing transcript, followed by the page(s) number(s) being cited. GCX __ and RX __ refers to Petitioner's and Respondent's exhibits respectively in the administrative record.

Danita Alexander started working as a psychiatric nurse at Respondent's West Philadelphia location in December 2021. (T. 28, 30; GCX 57) In September 2022, Myra Heard, a full-time psychiatric nurse at the West Philadelphia location, spoke with Alexander and other nurses about their work concerns.[24] (T. 33, 94,  ) Heard and Alexander wrote a letter addressed to Respondent's leadership, which discussed low morale, unfair pay discrepancy between pool nurses and full-time and part-time nurses, and their desire for a pay increase. (T. 34, 35; GCX 17). On or about September 25, 2022, Alexander and Heard faxed the letter to Respondent's Human Resources Department in Quakertown, PA, on behalf of the nurses who signed it. (T. 34-35, 92, 98-99) The letter specifically listed the names of the eight nurses, including Heard and Alexander. Heard and Alexander spoke to the other nurses before including them on the letter. (T. 89-90, 92, 98; GCX 17) Respondent admitted receiving the petition. (GCX 58, p. 3.)

After the letter was sent to Respondent, Speakes sent out an invite for employees to meet individually but the employees wanted to meet as a group because it was a group effort. (T. 35, 99) Speakes then sent out a group invite for a zoom meeting. About five to six nurses attended the meeting. (T. 36, 99)

Unsatisfied with the response by Respondent, Heard reached out to Union Representative Basir McCoy. (T. 38-39, 99) Alexander and Heard began organizing a union and talking with other employees about signing authorization cards. (T. 38-39, 100) At some point the Union filed a petition for a representation election.

On February 23, 2023, Mason sent an email to the nurses about her feelings opposing

---

[24] One of the major concerns was that per diem nurses had been given a raise to $50 per hour but full-time and part-time nurses were not. (T. 98) Alexander was at that time a per diem nurse, who made $50 per hour. (T. 28, 229; GCX 55)

unionization along with an optional Zoom meeting invitation for a nurses' forum on February 24, 2023. (GCX 18)

Internal notes of Respondent prior to the scheduled election show that Respondent was aware of the three main Union supporters, including Alexander and Heard, and was keeping track of how it believed employees would vote.[25] (GCX 76)

On March 16, 2023, the Union won the representation election with seven psychiatric nurses voting for Union representation and six voting against.  (T. 101, 175; GCX 1(ee), par. 5, GCX 1(gg), par. 5)

On May 5, 2023, the Union was certified as the exclusive bargaining representative of all full-time, regular part-time and per-diem registered nurses at the three locations in Philadelphia, Pennsylvania. (T. 175; GCX 1(ee), par. 5, GCX 1(gg), par. 5)

### C. *Respondent Suspends Lead Union Activist Danita Alexander Soon After She Makes Protected Concerted Complaints*

After the election, in the spring of 2023, Devlin came to the West Philadelphia facility to see how everybody was doing. Devlin asked how things were going. Alexander told him that she was sorry that it came down to the nurses having to become unionized. Devlin said he was sorry. Alexander told him the Union could have been avoided if Respondent had addressed employees' complaints earlier. She also told him about issues with staff mistreating residents. Devlin gave her

---

[25] While the memo is undated and does not list an author, it was produced pursuant to subpoena by Respondent in response to item 21: "those showing written communications among Respondent's managers, supervisors, and agents regarding the following subjects. … Subsection B union activity by employees at Respondent's facilities." While Respondent objected to its admission, arguing that it did not know who authored the document, Respondent admitted that it was in its possession. (T. 277.)

his business card and told her that if she had any other issues she could reach out to him. (T. 41-42, 84-85)

In April 2023, Respondent conducted voluntary stay interviews of employees through a third-party company called McCloskey and Associates to obtain feedback on the work environment. (T. 43, 223) After being given assurances that her answers would not impact her employment, on or about April 21, 2023, Alexander participated in a stay interview with Kim Wiseman, Consultant for McCloskey and Associates, and gave open and honest answers about what she liked and disliked about the company. (T. 43; GCX 41(b)) Wiseman asked Alexander if she wanted to give her name for the survey or be anonymous. Alexander gave her name because she felt that if she did "it would be for the good, it would bring out change." (T. 44-45)

On April 27, 2023, then HR Director Samantha Perch requested to meet with Alexander on May 1, 2, or 3, 2023 to discuss "a number of concerns" Alexander had raised in her stay interview, stating that the "issues you raised warrant a further investigation by New Vitae if they are legitimate." (T. 46-47; GCX 21) On May 2, 2023, Alexander informed Perch by email that she felt uncomfortable meeting with her. (T. 46-47; GCX 22)

On May 2, 2023, shortly after Alexander responded to Perch declining the invitation, Perch reached out by email to Devlin, Speakes, Yanacek, Mason, and Respondent counsel, asking how she should respond. (GCX 54, p. 5)

On May 3, 2023, Devlin responded to Perch with the following, in pertinent part:

> Just so we are all clear she refused to meet with us today? Is that correct?
> I personally think we should suspend her today & not let her sign up for any more shifts until she meets with you /us. If there is a possibility to terminate her because of not wanting to meet with us, that would be my first option.

(GCX 54, p. 3). Yanacek agreed with Devlin that Alexander "should be off the schedule until there's a meeting." (GCX 54, p. 3)

On May 4, Perch informed Alexander that she was suspended until she agreed to meet with her. (T. 47-48; GCX 23, GCX 75) That night Alexander emailed Devlin seeking his help.[26] (T. 49; GCX 24) He did not respond back to her. (T. 50) She also contacted the Union. (T. 49; GCX 25, GCX 26, GCX 27, GCX 37) She then agreed to meet with Perch on May 5, 2023, via zoom with her Union representative Administrative Organizer Paul Grubb. (T. 53, 127; GCX 28)

### D. Respondent Threatens Discipline and Instructs Lead Union Activist Danita Alexander to Not Discuss Her Complaints with Other Employees

On May 5, 2023, via Teams, with Grubb, Alexander met with Perch, and HR Representative, Yardley Georges, to discuss Alexander's stay interview responses. (T. 53, 90, 132; GCX 38) Perch started to ask Alexander some questions regarding her nepotism concerns. However, the technology for Alexander glitched. As a result, Grubb suggested rescheduling and the meeting ended shortly after it started. (T. 53, 132-133, 135; GCX 38(a)&(b)) The meeting was rescheduled for May 8, 2023. (T. 54, 135) Alexander was not allowed to work during this time. (T. 56, 85, 136)

On May 8, 2023, Alexander, Grubb, Administrator Samara Speakes, and Georges met in person at Respondent's administrative facility in Philadelphia, Pennsylvania. Perch attended remotely. (T. 54, 135) During this meeting, Perch questioned Alexander regarding issues that Alexander had brought up during the stay interview. (T. 54, 135, 376, 377) Alexander told her that Respondent had been retaliating against her since the employees organized a union, by not giving her shifts. (T. 55, 135; GCX 39, GCX 51) At the close of the meeting, Perch orally instructed

---

[26] The email appears to be from Alexander's work email although Alexander believed that she had been locked out of Respondent's email system at that time. (T. 86; GCX 24) However, other emails of that time period are both sent to and from Alexander's personal email. (GCX 23, GCX 28, GCX 75)

Alexander that nothing should be spoken about the things that were discussed in the meeting or else she would face discipline. (T. 56, 136-137.) Grubb asked for clarification as to what Alexander was not permitted to speak about because it seemed to him that a lot that was discussed at the meeting was "just normal terms and conditions of employment, things that workers regularly speak of." (T. 137) He did not get clarification. (T. 138) The meeting lasted about 45 minutes. (T. 56, 143)

After the meeting, Alexander was allowed to return to work. (T. 56, 85) At that point she had missed two shifts. (T. 56) She did not get paid for the missed shifts nor for attending the meetings on May 5 and 8, 2023. Prior to this meeting, she had been paid for attending mandatory meetings held by Respondent. (T. 57-58)

E. ***Respondent Retaliates Against Alexander Because of Her Union and Protected Concerted Activities by Reducing Her Hours, Giving a Negative Evaluation, and Discharging Her***

Although Alexander's suspension was lifted, Alexander had difficulty obtaining per-diem shifts after the May 8, 2023 meeting with Perch. As a per-diem nurse, Alexander routinely picked up 12-hour shifts. Nurses select the available shifts through an app called Paycom and Mason would approve the shifts. (T. 61-62, 88, 102-103) However, Alexander was denied at least 1-3 shifts per bi-weekly pay period starting about May 2023. She also noted that the per diem shifts she used to work regularly were now often awarded to per diem nurse Juanita Cooper, who was vocally anti-union.[27]  (T. 65)

---

[27] For some reason, Cooper, who was admittedly part of the bargaining unit until she was promoted in January 2024, does not show up on the shift schedules for 2023. (T. 66, 358; GCX 61, GCX 63, GCX 64)

Prior to her suspension in May 2023, Alexander received between eight and eleven shifts a month. After her suspension in May 2023, Alexander only had two months where she received comparable amounts of shifts. (GCX 63, GCX 64) Alexander's paystubs for 2022 and 2023 show that Alexander worked less hours after her suspension and never returned to the level that she had prior to her suspension. Her hours worked per two-week pay-period dropped from an average of 58 prior to May 1, 2023, to an average of 35 thereafter. (GCX 55, GCX 56.)

About August 21, 2023, Mason downgraded Alexander's mid-year evaluation with an overall 3 rating, and a 2 in accountability.[28] (T. 66; GCX 32(b)) In the comments of the accountability section of her evaluation, it states "Experienced access deactivation lead by HR due to non-compliance with HR directives." (T. 67; GCX 32(b)) After receiving the evaluation, Alexander emailed Mason asserting that she was not disciplined by Human Resources, and it should not have affected her appraisal. (T. 67; GCX 32(a).) Mason responded, "The appraisal does not include language of "discipline" but does reflect accountability overall as a New Vitae employee which is why it is included." (T. 68; GCX 33)

On August 24, 2023, Alexander reached out to Perch because she was not satisfied with Mason's response. In addition to questioning the negative rating, Alexander also questioned why she was not getting shifts. (T. 69; GCX 49) Alexander also reached out to Grubb. (T. 148)

Around this same time, Perch was replaced by Maribel Poretta as HR Director.[29] With no resolution in reference to her evaluation, sometime prior to October 17, 2023, Alexander had a phone conversation with Poretta about her evaluation. Poretta told her that she would have Mason

---

[28] The appraisal was done on a five-point system. (T. 249.)

[29] Perch became a HR Business Partner under Poretta. (T. 216; 375)

change the "2" in accountability because Mason wasn't present at the meeting.[30] However, Alexander never got confirmation of that change. (T. 72-73, 88, 303-304)

On October 17, 2023, Alexander emailed Poretta asking to meet about her concerns. On October 18, 2023, Poretta responded by suggesting that they talk the following week. Alexander emailed back that she would check her schedule and get back to Poretta. (T. 72; GCX 35(a))

On October 24, 2023, Poretta emailed Alexander informing her of Respondent's intent to terminate Alexander's employment the next day.[31] She did not provide a reason. (T. 321; GCX 35(b))

On October 25, 2023, Alexander and Grubb met with Poretta and Speakes on Teams. (T. 75, 298) Grubb indicated that they had wanted to meet to discuss Alexander's evaluation and other related issues and questioned why Respondent was now terminating her. Poretta refused to give a reason for the termination and only stated that Alexander was an "at will" employee in the Commonwealth of Pennsylvania. Grubb asked if it was because of Alexander's union activity. Poretta responded that Respondent was terminating her employment.[32] (T. 75, 157; GCX 47)

---

[30] Poretta in her testimony falsely claimed that Alexander had been given a "1". (T. 304)

[31] Poretta insisted in her testimony that she had emailed Grubb and Alexander on October 15, 2023 but Respondent admitted that the there was no email dated October 15, 2023 and that the actual date of the email referred to in Poretta's testimony was October 24, 2023. (T. 245, 291-292, 312, 313-314; GCX 34(b)) It should also be noted that the email went only to Alexander and Grubb was not copied as she claimed. (GCX 34(b))

[32] Poretta falsely claimed that Grubb went crazy and yelled at her that it was because of the Union that she was firing Alexander. (T. 299) Grubb's notes provide the following account:

Paul introduced himself
Danita Alexander had written to meet regarding New Vitae employee evaluations and related things.
The email from Maribel about setting up the 12:30 call stated meeting would include New Vitae's intent to discharge Danita Alexander.
Paul: You've introduced an interesting element. You go first. What's up?
Maribel: OK, at this time, New Vitae is separating ways. We're terminating Danita's employment as of today.

Respondent provided no paperwork to Alexander regarding her termination. (T. 75) Respondent admitted that prior to her termination, Alexander had not received any corrective actions or discipline during her employment at Respondent. (T. 76, 161, 244, 245)

Respondent contended in the proceedings before the ALJ that it suspended Alexander because she was refusing to participate in an investigation of alleged tampering of video with regard to a patient elopement—where a patient leaves the facility unattended without permission— and that it had a responsibility to investigate because of licensing implications.[33] (T. 333-336) However, the documentary evidence provided by Respondent establishes that the investigatory interview on May 8 was primarily focused on her work complaints that she had raised. Only at the very end was Alexander asked about the elopement. Alexander denied any first-hand account of

---

Paul: Why is that?
Maribel: We're terminating her employment as of today.
Paul: But why? As in any incident or investigation? What do you have?
Maribel: At this time, we're terminating her employment.
Paul: I'm to take your refusal to answer the direct question that it's for no reason at all?
Maribel: Sir, there is a reason. The State of Pennsylvania is an "at will" state, so at this time, we're terminating her employment.
Paul: You consider her at will, even though she's in a bargaining unit certified and recognized by the National Labor Relations Board and by majority vote of the RNs.
Maribel: At this time, we are terminating her employment.
Paul: Wouldn't it happen to involve her raising issues of concern? It appears so to me. Does it have anything to do with her being a principal supporter of the Union at New Vitae?
Mariel: At this time, we're terminating her employment.
Paul: Your silence on the questions speaks volumes. Anything else you have to say?
Maribel: No, Sir, that would be it.
Paul: Danita, is there anything else I should raise in this meeting? It appears we will only get the party line and the Guy Vilim script.
Danita: No. Not at this time.
Paul to Maribel: OK, you stole the show.
Maribel: Have a good day. Thank you for your time.
Paul: Go to hell.

[33] Yanacek testified that she initiated the investigation but could not say how she initiated it or to whom she spoke to it about. (T. 365-366)

the alleged elopement or that any video had been doctored and only knew about it through other employees. (T. 54, 55, 81-82)

Respondent also contended in the proceedings before the ALJ that it ultimately discharged Alexander for bullying mentors, the direct care employees that psychiatric nurses oversee, based on an anonymous phone call complaining about her and Respondent's subsequent investigation into the alleged bullying.[34] (T. 292-293, 295-297) Respondent referenced a policy in its handbook, which it never produced, claiming it had zero tolerance for bullying.[35] (T. 282-283) However, the evidence produced at the hearing was for the most part dated after Alexander's termination and Respondent never provided any reason to Alexander or the Union for her termination.[36] (T. 75, 155-156, 157; GCX 47; RX 6) Respondent also referenced "conflict resolution" issues with regard

---

[34] Poretta asserted that Carl Coleman, another psychiatric nurse, made the anonymous complaint about Alexander that started the investigation. (T. 318) Poretta's testimony is clearly not credible as Coleman worked at the South Philadelphia facility, and did not work with Alexander during any time from May 1, 2023 through the time of her discharge. (T. 159; GCX 63, GCX 64) Moreover, when testifying about the anonymous call on direct, Poretta stated, that the employee told her that Alexander "was belittling *her*, … yelling at *her*, making *her* feel like *she* didn't know what *she* was doing, that she was *her* boss, and yelling at *her* at the top of her lungs." (T. 292) (emphasis added) Poretta further testified on cross that she decided to terminate Alexander after the fourth employee she spoke to, and it was too much. (T. 315) Poretta claimed that for her investigation she reached out to four or five employees on Alexander's shift. (T. 292) One of the employees Poretta claimed she interviewed was "Nana," a psychiatric nurse, who wanted to be anonymous "because *she* felt she was going to be retaliated against." (T. 317) Like Coleman, Nana Adu-Gyamfi is male and worked at the South Philadelphia facility. (T. 164; GCX 63, GCX 64)

[35] Poretta testified that she had terminated four employees, including Alexander for bullying. She claimed that she also terminated a supervisor at the West Philadelphia facility for bullying. The other two terminated were at non-RTFA facilities. (T. 304-305, 306)

[36] Poretta incredibly asserted that she accidentally misdated the documents showing her interviews with mentors in her investigation, and that the dates she interviewed employees were really in October and not November 2023. (T. 316, 325-326, 327)

to Alexander in her performance appraisals but admittedly never disciplined her.[37] (T. 285, 286, 311) Speakes testified that she attended three conflict resolution meetings, between the end of 2022 and May 2023, involving Alexander that involved concerns about how Alexander communicated with other employees.[38] Again, Alexander was never disciplined for her behavior.[39] (T. 383-384)

Carl Coleman, another psychiatric nurse who engaged in conduct Respondent determined to be creating a hostile work environment in August 2023, was given only an initial warning.[40] (T. 158, 160, 243, 309, 310; GCX 48) Coleman also received a written warning in March 2024, where he was also given reasons for his discipline.  (T. 158, 160)

In Respondent's "Check In with Staff," Georges was tasked with following up with mentors and RNs "to collect some feedback from them on their opinion of their work environment." (GCX 53) In the June 2023 feedback shared by Georges, mistreatment by multiple other nurses was raised but Alexander's name was not among them. (T. 319-320; GCX 53, pp. 2-3, 5, GCX 77, GCX 78)

### F.  The Union Requests Bargaining and Information

---

[37] Poretta testified that Alexander's 90-day performance appraisal signed on March 28, 2022, mentioned working on conflict resolution, but that appraisal was wrongly dated December 6, 2022 and not offered into evidence. (T. 286, 294-295, 311)

[38] Speakes could not recall if there was any documentation of those three conflict resolution meetings. (T. 385)

[39] Speakes was very evasive in answering whether the other parties in the conflict resolution meetings with Alexander received discipline, finally stating that they did not. (T. 387)

[40] The discipline was not provided pursuant to subpoena but was given to the Union by Respondent in response to the Union's May 9, 2023 information request. (T. 176; GCX 3) Poretta noted that the discipline fell under Respondent's harassment policy. (T. 244, 308: GCX 48) She admitted that there might have been additional disciplines that she missed providing to General Counsel pursuant to the subpoena because she was looking for terminations. (T. 310)

On May 9, 2023, the Union requested to bargain with Respondent over the newly certified bargaining unit and further requested twelve items of information necessary for the Union to craft its bargaining proposals. (T. 175, GCX 2) Meanwhile, Respondent sought Board review of the Regional Director's certification decision. On June 22, 2023, the Board denied Respondent's request for review of the Region's decision to certify the Union.[41] In late July 2023, Respondent filed a petition for review of that representation case order directly with the U.S. Court of Appeals for the Third Circuit. On August 16, 2023, the Court of Appeals dismissed Respondent's petition for lack of jurisdiction.[42]

On October 31, 2023, one week after the Employer's termination of Alexander, who had volunteered to participate on the Union's bargaining team, Respondent responded to the Union's May 9 bargaining demand.  It provided information responsive to the Union's May 9 information request and asked the Union to provide initial bargaining dates. (T. 176; GCX 3)

On November 2, 2023, the Union responded that it would send available dates and was in the process of putting together its bargaining team. (GCX 4) In the following months, the employees that the Union approached declined to participate on the bargaining team, with most stating they were afraid of retaliation because of Alexander's termination.[43] (T. 104-106, 163-164,

---

[41] The Board's one-line summary order can be found at the following link: https://apps.nlrb.gov/link/document.aspx/09031d4583ab429f.

[42] *New Vitae Wellness & Recovery v. NLRB*, 23-2327 (3d Cir. August 16, 2023).

[43] In the beginning of 2024, Grubb continued to contact employees to build turnout for the next meeting with employees. (T 170) On or about March 14, 2024, at an in person meeting with employees (attended by Alexander, Heard, West, Coleman, and Elijah Love), Grubb solicited employees to be on the bargaining committee. (T. 163-164, 169) When questioned about serving on the bargaining committee, the employees expressed fear of repercussions if Respondent knew they were supporting the Union. (T. 163-164) Coleman refused to join the bargaining committee because he was afraid of losing his job. (T. 106) Heard was also afraid of losing her job and refused

170-171)

Despite being unable to confirm an employee participant for the bargaining team, on December 11, 2023, the Union provided Respondent with five proposed bargaining dates in January 2024. (GCX 5) The Union prefers to have employees on the bargaining committee but has bargained without employees as part of the bargaining committee. (T. 171)

On December 13, 2023, Respondent responded by saying it would get back to the Union once it confirmed availability for its bargaining team, and it included in the email a short proposal about changes to its performance reviews and associated merit wage increases. (GCX 5) The Union did not respond to that email because it sought to bargain about wages during regular negotiations and understood that Respondent would get back to it about proposed bargaining dates. (T. 177-178, 200) Respondent did not get back to the Union with any bargaining dates. (T.178, 203)

In December 2023 and January 2024, Respondent did not grant the unit employees holiday bonuses or provide them with the usual merit wage increases. Respondent had a past practice of granting bonuses and merit wage increases yearly, but that winter it granted them only to non-unit employees, such as supervisors and non-nursing staff members. Respondent admits to having provided merit raises and holiday bonuses to non-unit employees that winter but defends its failure to provide them to unit employees on the basis that there was no contract in place with the Union at the time.[44] (T. 250, 253, 254-255, 257; GCX 65, GCX 66, GCX 67)

---

to commit because she did not want to be the only employee on the bargaining committee if no one else was willing to step up. (T. 104-105, 106)

[44] Respondent also did not provide merit raises or holiday bonuses to the unit employees during the 2024-2025 winter season because by that time it had unlawfully laid off all the bargaining unit employees.

On June 7, 2024, Respondent emailed the Union to check in on bargaining. (T. 201; GCX 6) Following this email, the Union again attempted to find an employee willing to be on its bargaining team but was unable to do so until October 2024.[45] (T. 106, 163-164, 169)

On June 27, 2024, the Union responded by requesting an updated employee roster and offering several bargaining dates after the July 4, 2024 holiday. When Respondent did not respond, the Union reiterated its requests on July 9, 15, 22 and 29, 2024. On September 15, 2024, the Union again reiterated its request for an updated employee roster and bargaining dates, and it also requested additional employee wage information. (T. 179-180; GCX 7(a), (b), GCX 8) On September 20, 2024, Respondent responded that it was working on a response to the requests for information and suggested two dates in October for bargaining. (GCX 8)

### G. The Parties Start Bargaining and Respondent Decides to Layoff the Bargaining Unit and Subcontract the Work to Agency Nurses Without Notifying and Bargaining with the Union

Also on September 20, 2024, Michelle Beck, Respondent's Vice President, Business Operations, sent an email with the subject line "Philly Nurses W2s vs Agency Staff Cost" to Yanacek. It showed the weekly cost of using: (i) Clipboard agency nurses and LPNs[46] at $10,789; (ii) US Medical agency nurses and LPNs at $10,075; and (iii) bargaining unit nurses at $10,713

---

[45] On October 4, 2024, the Union held another meeting with employees that was held at a restaurant to solidify an additional bargaining committee member, in addition to Alexander and to get ready for the first bargaining session with Respondent. (T. 165-166, 172) Grubb testified that Coleman refused to join the bargaining committee because he needed his job and he was afraid of getting fired. (T. 168) After Feliciano Coggins, the new Staff Representative, encouraged Heard to be on the bargaining committee she changed her mind and agreed to be the only employee on the negotiating committee for the upcoming bargaining session. (T. 106, 167) She agreed saying, "Okay, you got to stand for something or you fall for anything." (T. 106) Heard testified that she asked two or three other nurses to join her on the bargaining committee and they all told her no. (T. 106-107)

[46] The cost analysis assumed that Respondent would "schedule half LPNs and Half RNs when using Agency Staff" at the West Philadelphia facilities. (GCX 73, p. 3)

per week.[47] (T. 256; GCX 73, p. 2) Beck noted, "The difference isn't that big. Technically [i]f you could obtain all nurses from US Medical it's the cheapest option. So its up to you what works best for Philly operations." (GCX 73, p. 2)

At that time, Respondent used agency nurses to fill in RN positions when necessary, such as for vacations and time off but they were not used to solely operate the RFTA facilities. (T. 30-31, 96-97, 259, 338, 360) According to Yanacek, about fifty percent of the nursing shifts at the RTFAs were filled by agency nurses. (T. 339) The majority came from Clipboard.[48] On the schedule, the agency nurses would be referred to as "Nurse Jane." (T. 61-62, 79-80, 97; GCX 63, GCX 64) There were also two agency nurses from US Medical. (T. 97-98)

On October 3, 2024, Respondent provided the updated roster of bargaining unit employees and the raise and bonus information for employees requested by the Union, showing that none of the bargaining unit employees had received a raise or a holiday bonus for 2023.[49]  (GCX 9(a)(b)) This was the first time that the Union became aware that no one in the bargaining unit had received a holiday bonus/gift or a raise in 2023, despite having received holiday bonuses and raises in years

---

[47] Poretta testified that she thought the contract with US Medical was signed in October 2023, but Respondent signed a contract with US Medical in December 2023. (GCX 14(b)) Notably, Respondent claims the contract with US Medical allows it the flexibility to hire as many or as few contract nurses as it needs. (T. 338-339)

[48] Poretta testified that she thought Respondent stopped using Clipboard in August 2023 but was not sure. (T. 301)

[49] Respondent has both "holiday gifts" and "holiday bonuses." Bargaining unit employees received holiday "gifts" but employees and Respondent counsel have both referred to the holiday "gifts" as holiday "bonuses." (T. 117, 251; GCX 9(a); GCX 65, GCX 66, GCX 67) Heard testified that she received a holiday bonus every year until 2023. She further testified that nurses asked about their lack of holiday bonuses in 2023 and Mason told them they had not received it because of the Union. (T. 117, 120)

prior to Union certification.[50] (T. 181; GCX 67, p. 3).

On October 10, 2024, the parties met for their first bargaining session. The Union's bargaining committee consisted of Union counsel, Executive Vice President Clarice Walker, Coggins, and Heard.[51] Respondent counsel and Poretta represented Respondent. (T. 107, 181, 182, 202) The parties made progress on non-economic proposals and tentative agreements were reached. Monetary issues, however, were not discussed at this session. (T. 109, 182-184, 201) At the end of the session, the parties scheduled the next session for October 24, 2024. (T. 184)

On October 23, 2024, Respondent counsel emailed the Union requesting to move the next day's bargaining session because "my client is contemplating re-working the workforce at its RTFA's in ways that could materially affect our bargaining. I have not had the opportunity to fully review or advise management on the contemplated changes…" No further explanation was provided at that time. (T. 184-185; GCX 10) Respondent requested to move the next day's session to the following week. The Union, by email, suggested November 1, 2024 at 11:00 a.m. for the next bargaining date. (T. 185-186; GCX 11)

On October 24, 2024, the Union emailed Respondent the Union's proposals for bargaining in order to keep things moving and progressing. (T. 185; GCX 11)

On October 25, 2024, Beck sent emails to Yanacek with severance options for the bargaining unit employees. (GCX 72)

---

[50] In an internal email dated September 24, 2024, Beck confirmed to Yanacek that Respondent had not paid holiday gifts to bargaining unit employees for 2023. "In 2023 nurses did not receive the gift. We were waiting on word related to the union and whether we could give it. Afterwards my team neglected to go back and give it." (GCX 67, p. 3)

[51] Alexander also came to support the process but did not attend the actual meeting. (T. 78, 108, 182, 202)

On October 28, 29, and 31, 2024, Poretta exchanged emails with Brittany Shustack and Brian Rahn from US Medical referencing orientation schedules for agency nurses at Respondent and other onboarding concerns for contract nurses that Respondent would be using from US Medical. (T. 262, 265, 268-269; GCX 68; GCX 69, GCX 70)

### H. At the November 1, 2024 Bargaining Session Respondent Announces the Layoff of the Bargaining Unit and Subcontracts Out the Work

On November 1, 2024, the parties met for their second bargaining session. (T. 110, 186, 202) Respondent announced to the Union that it had made the decision to "go contract" and that it would be laying off the entire bargaining unit later that day. (T. 187, 191) Respondent provided the Union with a document titled "Employer Proposal," which stated: "Effective 7:00 p.m., November 1st, all full-time and part-time and per-diem nurses will be laid off and their employment will be ended." Supervising nurses and other non-union staff were not included in the layoffs. The document included severance terms and information about employee healthcare, which Respondent said it was open to bargaining about. (T. 110, 187-188, 300; GCX 12) Poretta testified that it was Respondent's plan to bargain over the layoffs and severance pay. (T. 301) The Union was taken aback and stated that it needed to digest it a little further before the Union was prepared to address it. Respondent agreed and the parties broke for caucus. (T. 188, 300)

While caucusing, the Union sent Respondent an email that Respondent was required to bargain over its decision to subcontract bargaining unit work and requested copies of subcontracts with the different agencies Respondent was using to replace bargaining unit employees. (T.189; GCX 14(a), p. 5)

Not long after, the Union bargaining committee re-entered the room and demanded bargaining over Respondent's decision to subcontract, as a mandatory subject of bargaining. The Union informed Respondent that it was not appropriate to bargain over the effects when the parties

had not bargained over the decision to subcontract. The Union again requested a copy of the contract with the outside agency that Respondent counsel had referenced. Respondent counsel said there were actually two agencies and that he would provide them when he had them. (T. 190) Prior to this meeting, Respondent did not inform the Union about any plans to lay off bargaining unit employees or to subcontract their work. (T. 191)

As of that evening, without notice, Respondent no longer allowed bargaining unit employees to work. (T. 111-112) Respondent continued to employ mentors at the RFTA facilities after November 1, 2024, despite also using US Medical to fill three mentor positions. (T. 258, 322) Notably, vocally anti-union employee Cooper was promoted to a lead nurse position in January 2024 and was never laid off by Respondent. (T. 357-358)

On November 3, 2024, Respondent texted bargaining unit employees that they were being laid off and replaced by agency nurses. This was the first that employees were notified by Respondent except for Heard, who had been at the November 1, 2024 bargaining session. (T. 112, 113-114; 195, 196-197, 322; GCX 36)

In the subsequent weeks, Respondent did not respond to the Union's repeated questions about Respondent's motive for subcontracting. (T. 192; GCX 14(a), p.3, GCX 15, p. 2) On November 4, 2024, Respondent by email at 2:34 p.m. stated that it was "willing bargain over the use of contract employees in the future as part of overall bargaining but we are not obliged to state with the Union all of the Employer's thoughts or reasonings." Respondent asserted that it had an established practice it was not changing. Respondent added that it agreed "to delay the effective date and time of layoffs pending good faith negotiations over the terms of those layoffs." (T. 192-193; GCX 14(a)) However, at no point did Respondent agree to bargain over the layoffs itself.

In another follow up email at 2:39 p.m. that day, the Union pointed out that Respondent did not "have a right to subcontract the work of the bargaining unit without providing sufficient notice and opportunity to bargain with the Union over the decision to do the same." The Union further stated that it was premature to engage in effects bargaining of Respondent's decision since the Union had demanded to bargain over the decision. The Union reiterated that it had not yet received Respondent's reasoning/basis for its decision to subcontract the bargaining unit work. (GCX 15)

On December 18, 2024, the Union emailed Respondent "that, in addition to its pending demand to bargain over the Employer's decision to subcontract, the Union is also demanding bargaining over the decision to layoff the bargaining unit employees." (T. 193-194; GCX 16)

On January 28, 2025, Respondent emailed the Union stating that Respondent had not refused to bargain but that the Union terminated bargaining and filed an unfair labor practice charge. Respondent indicated that Respondent was ready to bargain and suggested meeting the second week of February. (GCX 16)

On February 3, 2025, the Union responded back, by email, reiterating that it was premature to engage in effects bargaining because Respondent had not yet engaged the Union with respect to its decision to subcontract, and its related decision to lay off the entire bargaining unit. The Union also pointed out that Respondent had not yet provided a reason for its decision to subcontract the work and lay off employees.  (T. 194; GCX 16)

Respondent only provided a reason to the Union at the hearing before the Administrative Law Judge. Yanacek testified that the decision to subcontract the bargaining unit and layoff all the psychiatric nurses was made because of cost—"there was substantial savings to be garnered if we made that move." (T. 342, 343) Poretta testified that the reason Respondent decided to subcontract

26

out the bargaining unit work was that it was cheaper. (T. 324) Respondent admits that the decision to contract all of the bargaining unit work out was made before November 1, 2024 by Yanacek and Beck. (T. 259) Respondent also admits that it never notified the Union or had any conversation with the Union about the cost savings of using all contract nurses. (T. 356)

Prior to the layoff on November 1, 2024, the average full-time and part-time hourly salary of Respondent's bargaining unit employees was $44.72, with benefits costing approximately $14.31 per hour, for a total of $59 per hour for those bargaining unit employees who worked more than 20 hours per week.[52] Per diem nurses were paid $50 per hour without any benefits, unless they worked more than 20 hours.[53] (T. 261; RX 1, p. 8) On October 3, 2023, Respondent had 17 psychiatric nurses. (GCX 9(b)) As of October 25, 2024, Respondent had prepared severance options for 14 bargaining unit employees—five full-time, one part-time, and eight per diem. It also shows that only the full-time and part-time nurses had any vacation and PD time off, and only three of the full-time employees used health insurance through Respondent (GCX 72)

A cost analysis by Respondent done in September 2024, shows the purported savings of using contract nurses over the bargaining unit nurse. According to Respondent, the savings using Clipboard would be $102,891 over a year and for US Medical it would be $276,644, a substantial savings over the cost of using bargaining unit nurses. (T. 348, 352; RX 1, p. 8) The same cost analysis also shows that the purported savings of using the two staffing agencies was due to the expected heightened use of LPNs, who are not in the bargaining unit, rather than the actual hourly

---

[52] Respondent asserted at the hearing that it would also achieve savings by not having to pay the additional cost of benefits by using contract nurses. (T. 260, 345, 347)

[53] The record is not clear whether it is 20 hours a week or 20 hours a pay period. (T. 261; GCX 55)

cost of the agency nurses.[54] (T. 343, 353-354; RX 1, p.8) RNs through Clipboard cost $64 per hour. RNs through US Medical cost $57 per hour. Respondent's own calculation of the average hourly cost of bargaining unit nurses is $59 per hour, which is only slightly higher than US Medical and significantly less expensive than Clipboard.[55] (T. 342, 345; RX 1, p.8) Respondent asserted it also had purported savings on oversight costs by using contract nurses – that it would reduce the amount of time needed by the HR person, would eliminate the lead nurse position, and reduce the amount of cost for Mason.[56] (T. 346, 350-351; RX 1, p.8) Respondent relied on this cost analysis in making the determination to solely use contract nurses. (T. 367) Respondent did not make a cost analysis chart for any employees other than the bargaining unit employees because the RFTA nurses were collectively Respondent's highest paid employees. (T. 366-367, 368)

Internal emails on September 20, 2024, between Beck, and Yanacek note that the cost difference between using the bargaining unit employees and using agency nurses "isn't that big." (GCX 73, p. 2) While Respondent claims that the Philadelphia locations generated a net loss in 2023, the record does not support its claim that this fact prompted its decision to seek savings through subcontracting. (T. 372) Respondent admitted that its overall business has long been profitable. (T. 374)

---

[54] LPNs are admittedly less expensive than RNs. (T. 323; GCX 73, p. 3; RX 1) LPNs need to work under an RN but the more LPNs that are used, the less RNs are needed. (T. 323-324) In August 2023, Respondent received permission to use LPNs at the RTFAs. Respondent used staffing agencies to staff the LPNs at the RFTAs. (T. 323)

[55] On cross examination, Yanacek could not or would not state whether Respondent factored in the straight cost of per diem bargaining unit nurses, which, at $50 and no benefits, cost less than any other option, into the cost analysis. (T. 361-362) She also did not know if the lower benefit cost of part-time nurses was factored into the calculation of the cost analysis. (T. 362)

[56] It is not clear from the record if the lead nurse position was eliminated after November 1, 2024 but Cooper, the person in that position, resigned only a few weeks before the hearing held on May 21, 2025. (T. 357, 369)

Currently, while two unit-employees have indicated they would not accept an offer of reinstatement, at least eight employees have indicated that they would accept such an offer. (Affidavit)

In most instances, Respondent does not deny these facts. However, where Respondent does dispute the facts, the District Court should resolve credibility in favor of Petitioner's witnesses for purposes of determining whether injunctive relief is needed, in accordance with the legal precedent set forth in Sections IV and V below.

## V.    **ARGUMENT**

### A. *Petitioner Has Shown a Strong Likelihood of Success on the Merits*

Testimony and documentary evidence adduced at the administrative hearing strongly supports the conclusion that Respondent unlawfully subcontracted out the bargaining unit work and laid off bargaining unit employees because they were represented by the Union and to avoid having to bargain with the Union. Here, on the same day that Respondent had its first bargaining session with the Union for the newly certified bargaining unit, Respondent determined to lay off the entire bargaining unit and subcontract work to agency nurses. At the next bargaining session, it then announced the layoff and subcontracting, and refused to give the Union a reason for the decision or to bargain with the Union over the decision. Consequently, it is very likely that the ALJ and Board will find merit to the violations alleged, and the court of appeals will affirm the Board in that regard.[57]  Accordingly, for the following reasons, Petitioner easily satisfies the first

---

[57] *See Frankl v. HTH Corp.*, 650 F.3d at 1355 (likelihood of success in a § 10(j) proceeding "is a function of the probability that the Board will issue an order determining that the unfair labor practices alleged by the Regional Director occurred and that [the court of appeals] would grant a petition enforcing that order").

prong of the *Starbucks Corp. v. McKinney* analysis described above, as there is a significant likelihood of success on merits.

1. *Petitioner Has a Likelihood of Success of Showing that Respondent Unlawfully Subcontracted Out and Laid Off the Entire Bargaining Unit Without Notifying and Bargaining with the Union, in Violation of Section 8(a)(5) of the Act.*

On the merits, there is a clear likelihood of showing that Respondent violated Section 8(a)(5) by subcontracting out and laying off the entire bargaining unit without first notifying and bargaining with the Union. Respondent had already decided to subcontract the bargaining unit work to two staffing agencies when it arrived at the bargaining session on November 1, 2024. This is shown by Respondent's internal communications as well as by its communications with US Medical.[58] The Union was completely blindsided by this announcement, especially since the parties had a productive first bargaining session on October 10, 2024, culminating in tentative agreements on non-economic items. The only warning was a cryptic email sent on October 23, 2024 by Respondent's counsel that he had to reschedule the following day's bargaining session because Respondent was contemplating making changes to the RFTA's that could "materially affect our bargaining."

In *Fibreboard Paper Prods. Corp. v. NLRB,* the Court determined that an employer violated Section 8(a)(5) of the Act when it contracted out maintenance work in order to reduce

---

[58] Poretta's testimony that she reached out to US Medical not to fill staff for November 1, 2024 but to prepare for November 7, 2024 so it would have a full staff in case the Union did not respond and Respondent laid off all the nurses, is not credible. (T. 263-264) Respondent clearly laid off all bargaining unit employees if not on November 1 within a day or two afterwards. It had no intention of having bargaining unit employees continue to work while bargaining with the Union, whether over the decision itself or even the effects.

labor costs without first bargaining with its maintenance workers' union.[59]  In *AFSCME Local 5*,

the Board commented:

> It is well established that an employer violates Section 8(a)(5) when it diverts bargaining
> unit work without bargaining with the union, irrespective of whether the diverted work is
> performed by statutory employees, independent contractors, supervisors, managers, or any
> other workers.[60]

Bargaining unit work is a mandatory subject of bargaining, and the unilateral transfer of the work

from unit to non-unit contractors violates Section 8(a)(5).[61] Respondent has a duty to notify and

bargain with the Union before implementing its decision to reassign job duties and eliminate

positions, as they are mandatory subjects of bargaining.[62] To be considered timely in satisfaction

of Section 8(a)(5), an employer's notice of proposed changes must be given sufficiently in advance

---

[59] 379 U.S. 203, 214-215, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). See also *Rigid Pak Corp.*, 366
NLRB No. 137, slip op. at 4-5 (2018); *O.G.S. Technologies, Inc.*, 356 NLRB 642, 644-647 (2011)
(subcontracting of bargaining unit die-cutting work to other firms); *Sociedad Espanola de Auxilio
Mutuo y Beneficencia de P.R.,* 342 NLRB 458, 467-469 (2004), enfd. 414 F.3d 158 (1st Cir. 2005)
(subcontracting of bargaining unit X-ray technician and respiratory therapy work performed in
Respondent hospital); *Torrington Industries, Inc.*, 307 NLRB 809, 810-811 (1992), abrogated
by *Furniture Renters of Am., Inc. v. NLRB*, 36 F.3d 1240, 1247 (3d Cir. 1994); *St. George
Warehouse, Inc.,* 341 NLRB 904, 904, 925 (2004), enfd. 420 F.3d 294 (1st Cir. 1005) (replacement
of directly employed bargaining unit warehouse employees with temporary agency employees);
*Regal Cinemas, Inc.*, 334 NLRB 304, 304, 312-313 (2001), enfd. 317 F.3d 300 (D.C. Cir. 2003)
(transfer of bargaining unit projectionist work to non-bargaining unit managers and assistant
managers).

[60] 364 NLRB 837, 872–73 (2016) (*citing Quickway Transportation, Inc.*, 354 NLRB 560 (2009);
*Naperville Ready Mix, Inc.*, 329 NLRB 174 (1999), enfd. 242 F.3d 744 (7th Cir. 2001); *Torrington
Industries*, supra.

[61] *New York Paving, Inc.*, 370 NLRB No. 44 (2020); *Clear Channel Outdoor, Inc.*, 346 NLRB 696,
702–03 (2006) (subcontracting of unit work unlawful unilateral change); *St. George Warehouse,
Inc.*, 341 NLRB at 923–24 (transfer of unit work to temporary agency employees unlawful
unilateral change).

[62] *Finch, Pruyn & Co.,* 349 NLRB 270, 277 (2007).

of the actual implementation of the change to allow a reasonable opportunity to bargain.[63] If the notice is given too short a time before implementation, or if the employer has no intention of changing its mind, then the notice is merely informational about a fait accompli and, accordingly, fails to satisfy the requirements of the Act.[64] Significantly, the Board finds that an employer has presented its proposed changes as a fait accompli when the announcement or notification is presented as a final decision, or if the union was not afforded an opportunity to bargain.[65]

The record evidence establishes that Respondent decided to subcontract out the bargaining unit work and lay off the entire bargaining unit solely based on the purported savings it could accrue from using staffing agencies instead of bargaining unit employees. Respondent's decision was not the result of a change in the scope or direction of the enterprise, but instead a substitution of one group of nurses for another. Respondent continued to provide the same services to the RFTA residents, with the only change that the work was performed by agency nurses rather than bargaining unit employees.[66] As a result, Respondent had an obligation to give notice to the Union and bargain with the Union before laying off the bargaining unit employees and subcontracting that work to agency nurses.

---

[63] *Ciba-Geigy Pharmaceuticals Division*, 264 NLRB 1013, 1017 (1982), enfd. 722 F.2d 1120 (3d Cir. 1983).

[64] *Gannett Co.*, 333 NLRB 355, 358 (2001) (citing *Ciba-Geigy Pharmaceutical Division*, supra).

[65] See, e.g., *Rieth-Riley Construction. Co., Inc.*, 373 NLRB No. 149, slip op. at 1, 10  (2024); *Pontiac Osteopathic Hospital*, 336 NLRB 1021, 1023-1024 (2001) (fait accompli where employer presented changes as a final decision to be implemented and ignored the union's request to bargain).

[66] See *DuPont Specialty Products USA*, 369 NLRB No. 117, slip op. at 1 fn. 3, slip op. 11-12 (2020), enfd. 2021 WL 3579384 (3d Cir. Aug. 13, 2021); *Rigid Pak Corp.*, supra (Board concluded that labor costs played a consideration in decision, warranting bargaining).

Respondent, however, did not provide notice of its decision or bargain with the Union. Respondent's November 1, 2024 announcement of the subcontracting of bargaining unit work and layoff of the entire unit was a fait accompli. Moreover, Respondent refused to provide a reason for its decision to subcontract and lay off all bargaining unit employees, demonstrating that it had no intention of bargaining about its decision. And indeed, it was only willing to bargain over the effects of the decision but not the decision itself.[67]

Furthermore, Respondent's argument that because it used agency nurses before November 1, 2024, and was simply continuing its practice of using staffing agencies to perform nursing work, it was privileged to replace all bargaining unit employees, is without merit. To the contrary, Respondent had never used staffing agencies to perform all bargaining unit work, but instead used them to fill in vacant shifts not selected by bargaining unit employees. This argument ignores the fact that work previously performed by unit nurses is now being performed by agency nurses. Respondent had full-time employees who worked the same shifts every week, and part-time and per-diem bargaining unit nurses who filled in the other available shifts. That Clipboard or US Medical had previously supplied some agency nurses to fill in shifts where necessary does not change the fact that all the work was now being done by agency nurses without bargaining with the Union.[68] Thus, there is a strong likelihood that the Board will find that Respondent violated Section 8(a)(1) and (5) of the Act by unilaterally subcontracting unit work to non-unit personnel

---

[67] Although Respondent's January 28, 2025 email to the Union asserts it was willing to bargain, Respondent has only ever offered to bargain over the effects of its decision and not the decision itself, claiming consistently that it had the right to contract all the work.

[68] *Mi Pueblo Foods*, 360 NLRB 1097, 1099–1000 (2014); *O.G.S. Technologies,* supra, (finding that the employer had a duty to bargain over marginal increase in subcontracting its die-cutting work, from 85 percent to 100 percent).

and laying off the entire bargaining unit without providing notice to the Union and affording the Union an opportunity to bargain over the decision.

The Third Circuit has a heightened standard for finding that a subcontracting decision is a mandatory subject of bargaining than the Board's standard discussed above.[69] In *Furniture Rentors of America*, the Third Circuit rejected the Board's application of the *Fibreboard/Torrington* analysis and instead considered whether the employers were motivated by labor cost issues amenable to collective bargaining, or other, entrepreneurial, factors.[70] Here the record evidence establishes that Respondent decided to subcontract out the bargaining unit work and lay off the entire bargaining unit solely based on the savings it believed it could accrue from using staffing agencies instead of bargaining unit employees, which is precisely the concern the Third Circuit noted in *Furniture Rentors* as an example of being within a union's control.[71] Moreover, the evidence is clear that Respondent decided to subcontract prior to the parties' November 1, 2024 bargaining session, and Respondent was not willing to bargain about that decision. Thus, there is a strong likelihood that the Board would find Respondent's announcement to the Union that it was "going contract" at the November 1 session, without bargaining to agreement or impasse over that

---

[69] See *Dorsey Trailers, Inc., v. NLRB,* 134 F.3d 125 (3d Cir. 1998) (holding that subcontracting was not a mandatory subject of bargaining because evidence was insufficient to conclude that the decision was based solely on a desire to reduce overtime).

[70] 36 F.3d 1240, 1247 (3d Cir. 1994) (quoting *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. at 214).

[71] Id at 1248 36 (duty to bargain extends where "employer's decision was driven by labor costs or some other difficulty that can be overcome through collective bargaining."); *see also Fibreboard*, 379 U.S. at 213-214 (concerns regarding potential cost saving from subcontracting deemed "peculiarly suitable for resolution within the collective bargaining framework").

decision, violated Section 8(a)(5), even under the Third Circuit's heightened standard.[72]

In its defense, Respondent claims that it had a right to refuse to bargain over this decision based on its established past practice of using contract nurses at its discretion. This defense fails. To start, Respondent admits it has been consistent in its use of contract nurses for many years, specifically, using them to fill three non-nursing staff roles and the per-diem nursing shifts that it was not able to cover with its own employees. But that historical usage fails to establish a "regular and frequent past practice" of hiring contract nurses to cover the entirety of Respondent's nursing work, or even close to doing so.[73] Moreover, any purported past practice was based on a high degree of discretion, which further undermines any claim that it had no duty to bargain over the subcontracting decision.[74] Finally, under extant Board law, a past practice of making unilateral changes that was developed before a union represented the unit employees is not a valid defense.[75] Thus, any defense based on purported past practice will fail.

2.  *Petitioner Has a Likelihood of Success of Showing that Respondent Unlawfully Subcontracted Out and Laid Off the Entire Bargaining Unit in*

---

[72] *Arbah Hotel Corp. v. NLRB*, 845 Fed. Appx. 181, 182 (3d Cir. 2021) ("Employers may not make major decisions about unionized employees on their own. Instead, they must work with unions in good faith to solve problems."), *enforcing* 368 NLRB No. 119 (2019).

[73] *Wendt Corp.*, 372 NLRB No. 135, slip op. at 6 (2023); *see also Citizen Publ'g*, 263 F.3d at 233 (rejecting employer's defense for failure to show change was a "continuation of an uninterrupted, established past practice"); *see also Raytheon Network Centric Systems*, 365 NLRB 1722, 1734 (2017) (past practice defense requires employer to show change is "similar in kind and degree to what the employer did in the past"), *overruled in Wendt*, 372 NLRB No. 135, slip op. at 13.

[74] *See NLRB v. Katz*, 369 U.S. 736, 746 (1962) (rejecting employer's past practice defense in part because changes "were in no sense automatic, but informed by a large measure of discretion"); *Wendt*, 372 NLRB No. 135, slip op. at 5 (past practice defense fails where it is "informed by a large measure of discretion").

[75] *See Wendt*, 372 NLRB No. 135, slip op. at 17. Notably, Respondent's past practice defense would also fail under the Board's prior standard in *Raytheon*, regardless of Respondent's discretion or when the past practice developed, because Respondent's unilateral action of subcontracting the entire bargaining unit is not "similar in kind and degree to what [Respondent] did in the past." 365 NLRB at 1737.

*Violation of Section 8(a)(3) of the Act*

There is also a clear likelihood of succeeding on the merits that Respondent violated Section 8(a)(1) and (3) of the Act by subcontracting and transferring the entire bargaining unit work to outside staffing agencies to avoid the Union. To establish that an employment action violates Section 8(a)(1) and (3) of the Act, Petitioner has the initial burden to demonstrate the following: (1) the discriminatees engaged in protected concerted activity or union activities; (2) the employer had knowledge of that activity; and (3) the employer took the employment action because of animus against the union or other protected activity.[76]

Animus may be inferred from circumstantial evidence, which includes, "among other factors, the timing of the action in relation to the union or other protected conduct; contemporaneous unfair labor practices; shifting, false, or exaggerated reasons offered for the action; failure to conduct a meaningful investigation; departures from past practices; and disparate treatment of the employee."[77] If Petitioner meets the initial burden under *Wright Line*, the employer may then escape liability if it demonstrates "that it would have taken the same adverse action even in the absence of the employee's protected conduct."[78] In meeting its burden, an employer cannot simply present a legitimate reason for its action but must persuade by a preponderance of the evidence that the same action would have been taken even in the absence of

---

[76] *Wright Line, Inc.*, 251 NLRB 1083, 1089 (1980), enfd. 662 F.2d 899 (1st Cir. 1981), cert. denied 455 U.S. 989 (1982), approved in *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 399-403 (1983). See also *Electrolux Home Prod., Inc.*, 368 NLRB No. 34, slip op. at 3 (2019); *Consolidated Bus Transit, Inc.*, 350 NLRB 1064, 1065 (2007), enfd. 577 F.3d 467 (2d Cir. 2009).

[77] *Intertape Polymer Corp.*, 372 NLRB No. 133, slip op. at 7 (2023), enfd. mem. 2024 WL 2764160 (6th Cir. 2024); *Lucky Cab Co.*, 360 NLRB 271, 274-75 (2014).

[78] See, e.g., *Electrolux Home Prod.*, supra, slip op. at 3; *NCRNC, LLC d/b/a Northeast Center for Rehabilitation*, 372 NLRB No. 35, slip op. at 1-2 fn. 5 (2022); *Consolidated Bus Transit*, 350 NLRB at 1066.

the union or protected activity.[79] Furthermore, if an employer does not assert any business reason, other than one found to be pretextual by the judge, then the employer has not shown that it would have taken the employment action against the employee for a lawful, nondiscriminatory reason.[80]

To start, the timing of the decision—which documentary evidence shows was first formulated, after a 17-month delay in bargaining, on September 20, 2024, the exact day it finally agreed to set a bargaining date—is evidence of animus.[81] Respondent's other bargaining-related misconduct further supports finding an unlawful motive for the subcontracting. Respondent's unilateral discontinuation of holiday bonuses and merit raises for unit employees, delay and refusal to provide relevant information, and refusal to meet and bargain over an extended period, collectively demonstrate an animosity toward the Union and the bargaining process that culminated in its destruction of the unit through subcontracting and layoffs.[82] In addition, Respondent's unlawful failure to notify the Union and bargain over its subcontracting decision despite its legal obligation to do so is itself evidence of animus.[83]

---

[79] *Rock Valley Trucking Co*., 350 NLRB 69, 70 fn. 8, 81 (2007) (citations omitted) (citing *W.F. Bolin*., 311 NLRB 1118, 1119 (1993), enfd. 99 F.3d 1139 (6th Cir. 1996)).

[80] *T&J Container Systems, Inc. d/b/a T&J Trucking Co*., 316 NLRB 771, 771 fn. 9 (1995), citing *Aero Metal Forms, Inc*., 310 NLRB 397, 399 fn. 14 (1993).

[81] *See, e.g., Eagle Material*, 558 F.2d 160, 170 (3d Cir. 1977) (timing of layoff of entire bargaining unit, coming one week after ALJ's decision recommending a bargaining order, supports inference of antiunion motivation); *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 814 (3d Cir. 1986) (timing and abruptness of layoffs significant in determining that union animus motivated decision).

[82] *See, e.g., Electrical Prods. Div. of Midland-Ross Corp. v. NLRB*, 617 F.2d 977, 986 (3d Cir. 1980) (noting, in affirming Board's order finding employer closed plant to chill union activity, that "[a] pattern of unfair labor practices often is used to show anti-union animus").

[83] *See, e.g., Union-Tribune Publ'g Co.*, 307 NLRB 25, 25 (1992) (Section 8(a)(5) allegations supported inference of antiunion animus), *enforced*, 1 F.3d 486 (7th Cir. 1993); *CJC Holdings*, 320 NLRB 1041, 1047 (1996) (in which Board affirmed administrative law judge's finding that "bad-faith tactics" demonstrated antiunion animus), enfd., 110 F.3d 794 (5th Cir. 1997).

Moreover, Respondent's suspension, reduction in hours and eventual termination of lead Union organizer Alexander also constitutes evidence that Respondent had animus against its employees' Union activity.[84] There is no dispute that Respondent was aware of Alexander's protected concerted and union activity. Indeed, Respondent suspended Alexander after she gave honest answers to Respondent's stay interview and complained about retaliation for her union activity.[85] Moreover, the record clearly shows that following her suspension, Respondent gave Alexander fewer shifts than she had previously worked as well as a negative evaluation.[86] When Alexander protested these unlawful changes, Respondent terminated her without giving a reason or giving her an opportunity to respond, despite having had no discipline prior to her termination.[87]

---

[84] *See, e.g., Midwest Terminals of Toledo Int'l*, 365 NLRB 1680, 1680 n.1 (2017) (Board's finding of animus supported by employer's prior discharge of union president in violation of Section 8(a)(3)), *enforced*, 783 Fed. Appx. 1 (D.C. Cir. 2019) (per curiam); *St. George Warehouse, Inc.*, 349 NLRB 870, 878 (2007) (Board's finding of animus in connection with employer's discriminatory discipline of employee supported by prior Section 8(a)(3) discharges and disciplines).

[85] *See e.g. Trader Joe's*, 373 NLRB No. 73, slip op. at 2 (2024). While Respondent defended its actions before the ALJ by asserting it suspended Alexander because she refused to meet with Respondent to address an issue brought up by Alexander in the stay interview regarding a possible tampering with a video recording in a patient elopement situation, Respondent admitted at the hearing that the issue was not brought up during Alexander's stay interview. Further Respondent expressed interest in terminating Alexander for declining the meeting when its own internal emails show that at most other employees were written up for failing to attend a mandatory meeting. See *Absolute Healthcare d/b/a Curaleaf Arizona*, 372 NLRB No. 16, slip op. at 2-3 (2022), enfd. in part and remanded on other grounds, 26 F.4th 1002 (D.C. Cir. 2022) (the Board will infer animus from circumstantial evidence, including disparate treatment in implementation of discipline).

[86] See *Somerset and Valley Rehabilitation and Nursing Center*, 362 NLRB 961 (2015), incorporating by reference 358 NLRB 1361, 1391-1392 (2012), enfd. 825 F.3d 128 (3rd Cir. 2016) (unlawful for an employer to reduce employee's hours of work if the reduction was motivated by union animus).

[87] See *Green Apple Supermarket of Jamaica, Inc.*, 366 NLRB No. 124, slip op. at 16, 17 (2018), enfd. mem. 805 Fed.Appx. 65 (2d Cir. 2020); see also *BS&B Safety Systems, LLC*, 370 NLRB No. 90, slip op. at 2 fn. 6 (2021) ( "unwillingness . . . to get at the truth" signals pretext) (quoting *Inter-Disciplinary Advantage, Inc.*, 349 NLRB 480, 509 (2007)).

The timing of her suspension and termination, and the shifting and exaggerated reasons provided for both, are all evidence of animus.[88] Ultimately, Respondent failed to demonstrate that it would have suspended Alexander, reduced her shifts, or terminated Alexander absent her protected concerted and union activity.[89]

The pretextual reason Respondent has given for subcontracting reinforces that it was motivated by animus. In September 2024, Respondent's Vice President, Business Operations noted that the financial difference between using bargaining unit nurses and contract nurses was minimal and stated that the decision should therefore be made based on "what works best for Philly operations." Respondent admits that its overall business has long been profitable while employing its own nurses.[90] Although Respondent claims that the Philadelphia locations generated a net loss in 2023, that had not been a new development, and it has not supported this claim with documentary evidence, nor did it introduce record evidence to support its recent claim that this fact prompted its decision to consider subcontracting. In any event, Respondent's argument in this respect is undermined by the contemporaneous documentary evidence that shows Respondent did

---

[88] See *Intertape Polymer Corp.*, 372 NLRB No. 133, slip op. at 7 (2023), enfd. mem. 2024 WL 2764160 (6th Cir. 2024); *Absolute Healthcare d/b/a Curaleaf Arizona*, supra, 372 NLRB No. 16, slip op. at 2-3; *Lucky Cab Co.*, 360 NLRB 271, 274-75 (2014).

[89] Respondent's defense that it terminated Alexander for bullying other employees is clearly without merit. Most of the notes of the "investigation," were taken after Alexander's termination and the description of who made the complaints was a clear fabrication. Moreover, even assuming that there was an anonymous complaint, Respondent had received other reports of similar complaints about the treatment of mentors during its investigation of Alexander's stay interview concerns, reports which do not mention Alexander, and it did not react similarly, with discharge. Indeed, a fellow nurse who violated the harassment policy was given only minor discipline. Thus, Respondent has not met its burden of showing it would have discharged Alexander even in the absence of her protected concerted and union activity. *BS&B Safety Systems, LLC,* 370 NLRB No. 90, slip op. at 2.

[90] *Eagle Material*, 558 F.2d at 170 (inference of improper motive appropriate where employer did not provide credible evidence that it had any legitimate economic justification for layoffs).

not expect to achieve any significant savings through subcontracting and by its failure to consider, as part of a purported "search for cost savings," any other way to reduce costs. Indeed, the costs per hour of agency nurses were either higher or very close to the cost of Respondent's full-time nurses even with benefits. Part-time and per diem nurses appear to have made less than any of the agency nurses. The savings came not from the use of agency nurses but from the additional use of LPNs who cost significantly less than RNs. In this regard, Respondent has failed to adequately explain why it chose to consider laying off only unit nurses without performing any cost-savings analysis for its other staff who were not members of the bargaining unit. Thus, because Respondent's defense is a pretext, and it cannot demonstrate that it would have subcontracted the unit work and laid off all the unit employees absent its Union animus, there is a clear likelihood of succeeding on the merits that the Board will find this conduct violated Section 8(a)(3).[91]

In sum, the administrative record fully developed before the ALJ establishes, by a clear preponderance of the evidence, that Respondent violated Sections 8(a)(1), (3) and (5) of the Act, as described above. Petitioner, therefore, will likely succeed on the merits of her unfair labor practice case before the Board.

**B.** ***Interim Relief is Needed to Prevent Irreparable Harm to Employees' Rights under Section 7 of the Act and Protect the Board's Remedial Power***

Congress has declared that "encouraging . . . collective bargaining" is "the policy of the United States."[92] Section 7 of the Act grants employees the decision "to bargain collectively

---

[91] *See, e.g., Un. Nurses Assocs. of Cal. v. NLRB*, 871 F.3d 767, 779 (9th Cir. 2017) (noting "[a]n employer cannot prove this affirmative defense where its 'asserted reasons for a discharge are found to be pretextual'"; discharge found pretextual where employer provided ex post facto justification for deviating from internal practice and treated employees who engaged in similar conduct disparately).

[92] 29 U.S.C. § 151.

through representatives of their own choosing."[93] Making that choice "without restraint or coercion by their employer" is a "fundamental right."[94] "[I]n the labor field, as in few others, time is crucially important in obtaining relief."[95] Here, Respondent's unilateral and discriminatory elimination of the entire bargaining unit threatens irreparable harm to the national labor policy encouraging collective bargaining embodied in Section 1 of the Act, the employees' right to organize under Section 7 of the Act, and the efficacy of the Board's ultimate remedial order.[96] Without an immediate injunction requiring reinstatement of the bargaining unit employees, restoration of the unit work, and bargaining over proposed unilateral changes, Respondent will succeed through its illegal conduct in permanently depriving its employees of the Union representation they desired, contrary to the Act's intent. Courts have routinely ordered interim injunctive relief under Section 10(j) for these reasons in cases where, as here, an employer has eliminated a bargaining unit by unlawfully subcontracting unit work.[97]

---

[93] 29 U.S.C. § 157.

[94] *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 33 (1937). *See also NLRB v. Broad St. Hosp. and Medical Center*, 452 F.2d 302, 304-05 (3d Cir. 1971) ("employees should be given maximum opportunity to select or reject bargaining representatives, and that trade union representation must reflect the will of the bargaining unit fairly achieved through democratic processes").

[95] *NLRB v. C & C Plywood Corp.*, 385 U.S. 421, 430 (1967).

[96] *See Chester v. Grane Healthcare Co.*, 666 F.3d 87, 92-93 (3d Cir. 2011) (in deciding whether to grant injunctive relief under Section 10(j), the "goal of preserving the Board's ultimate remedial power guides the courts to focus on whether the ongoing [unfair labor practices] would create 'irreparable' harms, i.e., injuries that could not be remedied by the Board's final decision").

[97] *See, e.g., Maram v. Universidad Interamericana de Puerto Rico, Inc.*, 722 F.2d 953, 959 (1st Cir. 1983); *Hubbel v. Patrish, LLC*, 903 F. Supp. 2d 813, 817-18 (E.D. Mo. 2012); *Bernstein v. Carter & Sons Freightways, Inc.*, 983 F. Supp. 994, 1007-08 (D. Kan. 1997); *see also Hirsch v. Dorsey Trailers, Inc.*, 147 F.3d 243, 248 (3d Cir. 1998) (temporarily enjoining employer under Section 10(j) from selling its plant and equipment where it was alleged to have failed to bargain over its decision to relocate bargaining unit work, which resulted in all plant employees losing their jobs); *Reynolds v. Curley Printing Co.*, 247 F. Supp. 317, 319-20, 323-24 (M.D. Tenn. 1965)

Respondent's elimination of the bargaining unit via unlawful subcontracting is likely to irreparably harm the statutory rights of the unit nurses by rendering a final Board order requiring their reinstatement, restoration of the unit work, and bargaining over unilateral changes meaningless. Interim reinstatement of the terminated nurses is critical to preclude the possibility that by the time a Board order issues, they will have found other employment and no longer be available to accept reinstatement.[98] Such relief is especially necessary in this case because even if the unlawful subcontracting is eventually rescinded and the unit work is restored, a final Board order requiring Respondent to reinstate the nurses and bargain with the Union over unilateral changes will likely be a nullity because the nurses who desired representation and elected the Union will have moved on or otherwise have given up on the Union,[99] which would effectuate Respondent's unlawful effort to permanently remove Union supporters from its workforce.[100] Indeed, one of the nurses who had served as a Union organizer and lost her job because of Respondent's unlawful subcontracting does not desire reinstatement, and as time passes this number will only grow.[101] Immediate reinstatement of the unit nurses, at least eight of whom

---

(granting injunctive relief under Section 10(j) where employer retaliated against its employees' union activity by either subcontracting their work or discharging them).

[98] *See, e.g.*, *NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1573 (7th Cir. 1996), *cert. denied*, 519 U.S. 1055 (1997); *Aguayo v. Tomco Carburetor Co.*, 853 F.2d 744, 749 (9th Cir. 1988), *overruled on other grounds*, *Miller v. Cal. Pac. Med. Ctr.*, 19 F.3d 449, 457 (9th Cir. 1994) (en banc).

[99] *See, e.g., Pascarell v. Gitano Group, Inc.*, 730 F. Supp. 616, 624 (D. N.J. 1990) (observing that, absent injunctive relief, "many employees may be forced to accept employment elsewhere and will therefore be unable or unwilling to return to their former jobs" by the time a final Board decision issues); *Broad St. Hosp.*, 452 F.2d at 305 (noting that an employer's failure to bargain will "deter[] their organizational activities" and acknowledging the Supreme Court's view that "union membership [should] be kept intact during delays incident to hearings") (quoting *Franks Bros. Co. v. NLRB*, 321 U.S. 702, 704 (1944)).

[100] *See Pye v. Excel Case Ready*, 238 F.3d 69, 75 (1st Cir. 2001); *Electro-Voice*, 83 F.3d at 1573.

[101] *Pascarell v. Orit Corp./Sea Jet Trucking*, 705 F. Supp. 200, 204 (D.N.J. 1988) (irreparable harm likely where, "by the time the Board renders its decision, several employees may be forced to

remain interested in reinstatement, and restoration of the work to the unit offers the best chance of

avoiding this result and ensuring that a Board order effectively protects statutory rights.[102]

Interim reinstatement is also crucial to ensure that the unit nurses are not "chilled" by

Respondent's egregious unfair labor practices from further exercising their statutory right to

support the Union. The unilateral and discriminatory destruction of a bargaining unit in retaliation

for employees' Union activity and to avoid a collective bargaining obligation predictably chills

that support and, thus, impedes collective bargaining.[103] The natural and foreseeable consequence

of the employer's layoff of the entire bargaining unit, effectively an unlawful mass discharge, and

coming as it did after the parties' first bargaining session for an initial contract, is that employee

support for the union will dwindle significantly.[104] Absent interim reinstatement under the

---

accept employment elsewhere and will therefore be unable or unwilling to return to their former jobs should reinstatement be ordered" (footnotes omitted)).

[102] *See Angle v. Sacks,* 382 F.2d 655, 661 (10th Cir. 1967) (interim reinstatement is "best visible means" of rectifying chill of protected activity). *See also Hirsch,* 147 F.3d at 248 (reversing district court and granting interim injunction precluding sale of plant and equipment because "failure to ensure the availability of the plant jeopardizes the Board's ability to effectively exercise its ultimate remedial powers"); *D'Amico v. NLRB,* 582 F.2d 820, 823 (3rd Cir. 1978) (the "'policy of the Act is to insulate employees' jobs from their organizational rights'" (quoting *Radio Officers' Union v. NLRB,* 347 U.S. 17, 40 (1954))).

[103] *See, e.g., NLRB v. Juniata Packing Co.*, 464 F.2d 153, 156 (3d Cir. 1972) (discharge of union supporter "is likely to intimidate employees who otherwise would be disposed to support unionization"); *NLRB v. Atlas Microfilming, Div. of Sertafilm, Inc.,* 753 F.2d 313, 319 (3d Cir. 1985) (discharge of union activist seen as "having a continuing impact").

[104] *See, e.g., Kobell v. Thorsen Tool Co.*, 1982 WL 2093, at *6 (M.D. Pa. Dec. 29, 1982) (injunctive relief appropriate where impending layoff of entire bargaining unit will "obviously have a strong detrimental impact on employee support for the [union] by reason of its ineffectiveness in protecting their collective bargaining rights"); *Sullivan v. Fairfield Parsippany, LLC,* 2025 WL 40086, at *16 (D.N.J. Jan. 7, 2025) ("the fear of employer retaliation after the firing of union supporters is exactly the 'irreparable harm' contemplated by § 10(j)") (cleaned up) (quoting *Overstreet v. Lucid USA, Inc*., 2024 WL 4186825, at *15 (D. Ariz. Sept. 13, 2024)).

43

protection of an injunction, however, a final Board order will come too late to erase the chilling effect left by Respondent's retaliatory action.[105] Any employees that accept reinstatement will have seen that workers who "attempted to exercise rights protected by the Act had been discharged" and waited for "years to have [their] rights vindicated."[106] At that time, reinstated employees would reasonably view the Union as ineffective in protecting them,[107] precluding the support necessary for effective bargaining and risking ouster by disaffected employees, and ultimately rendering the Board's order an "empty formality."[108] Indeed, many Courts of Appeals, including the Third Circuit, have recognized that discriminatory discharges, in and of themselves, will adversely affect employee interest in unionization and support an inference of irreparable harm to the Union's ability to effectively represent employees.[109] Interim reinstatement will offer the most favorable

---

[105] *See Pascarell v. Vibra Screw, Inc.*, 904 F.2d 874, 878-79 (3d Cir. 1990) (considering that "the chilling effect may outlast the curative effects of any remedial action the Board might take[,] including reinstating illegally discharged workers[,]" in determining whether injunction is necessary); *Eisenberg v. Wellington Hall Nursing Home*, 651 F.2d 902, 906-07 (3d Cir. 1981) ("[T]he discharge of 'active and open union supporters . . . risk(s) a serious adverse impact on employee interest in unionization.'") (quoting *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1053 (2d Cir. 1980)); *Lightner v. Dauman Pallet, Inc.*, 823 F. Supp. 249, 253 (D.N.J. 1992) (the Board's remedial power is impacted where "the termination of respondent's employees resulted in a 'chilling effect' on co-employees."), *affirmed mem.*, 993 F.2d 877 (3d Cir. 1993).

[106] *Silverman v. Whittal & Shon, Inc.*, 1986 WL 15735, at *1 (S.D.N.Y. June 6, 1986).

[107] *See Vibra Screw*, 904 F.2d at 881 (even if open union supporters are "ultimately reinstated by the Board . . . [e]mployees will not risk the uncertainty and hardship attendant upon even temporary lay-off if that is the price they must pay for union activity"); *Angle*, 382 F.2d at 660–61 (when the Board finally acts, "the employees then at the plant may not wish to exercise the rights thus secured to them").

[108] *Angle*, 382 F.2d at 660; *see also Hirsch*, 147 F.3d at 248.

[109] *See Sullivan*, 2025 WL 40086, at *16-*17; *Vibra Screw*, 904 F.2d at 881; *Frankl v. HTH Corp. (Frankl I)*, 650 F.3d 1334, 1363 (9th Cir. 2011) ("likelihood of success" in proving discriminatory discharge of union activists during organizing drive "largely establishes" likely irreparable harm, absent unusual circumstances); *Pye*, 238 F.3d at 74–75; *Schaub v. W. Mich. Plumbing & Heating, Inc.*, 250 F.3d 962, 971 (6th Cir. 2001); *Kaynard*, 625 F.2d at 1053; *Angle*, 382 F.2d at 660 (independent evidence of irreparable harm not required because illegal discharges during an organizing campaign "operate predictably to destroy or severely inhibit employee interest in union

circumstances for removing this pervasive chill and preventing Respondent from "dramatically shift[ing] the status quo in its favor through illegal means."[110] It will signal to the adversely affected nurses that the Board will timely protect them if they face retaliation for supporting the Union and, thus, bolster their willingness to continue doing so.[111]

Injunctive relief requiring rescission of the unlawful subcontracting and Respondent to bargain with the Union over any is also necessary to prevent irreparable harm. Without that injunctive relief, employee support for the Union, which is vital to a union's ability to bargain effectively, will likely quickly erode.[112] A union without such support has no leverage and is "hard-pressed to secure improvements in wages and benefits at the bargaining table."[113] With employees

---

representation, and activity toward that end"); *cf. Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 297–98 (7th Cir. 2001) (finding interim instatement of employees illegally refused hire just and proper even where "the Director chose not to make an independent case on irreparable harm").

[110] *Bloedorn*, 276 F.3d at 299; *Hoffman v. Inn Credible Caterers*, 247 F.3d 360, 369 (2d Cir. 2001) (where successor employer refuses to recognize incumbent union while hiring only non-union employees, interim relief necessary to "preserve the status quo" to protect Board's order from being rendered "meaningless in the context of a new majority workforce committed to non-unionization").

[111] *See Pye*, 238 F.3d at 74-75 (Section 10(j) interim relief prevents "employers from using unfair labor practices in the short run to permanently destroy employee interest in collective bargaining"); *Bloedorn*, 276 F.3d at 299; *Aguayo*, 853 F.2d at 749-50 (interim reinstatement "would revive the union's organizational campaign"); *Moore-Duncan v. Aldworth Co.*, 124 F. Supp. 2d 268, 294 (D.N.J. 2000) (impact of discharge of union supporters "must be countered swiftly and surely" to preserve employee support).

[112] *See Chester*, 666 F.3d at 102-03 (interim bargaining order necessary because "[a]n ultimate Board order that [the employer] recognize the Union may be ineffective if the Union has lost significant support"); *Maram*, 722 F.2d at 959-960 ("[t]he union, without early relief, may well be done for" in face of the discharge of an entire workforce); *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1193 (9th Cir. 2011); *Electro-Voice*, 83 F.3d at 1573; *Frye v. Specialty Envelope, Inc.*, 10 F.3d 1221, 1226-27 (6th Cir. 1993); *Asseo v. Centro Medico del Turabo, Inc.*, 900 F.2d 445, 454 (1st Cir. 1990) (recognizing that erosion of employee support jeopardizes union's ability to represent employees).

[113] *Moore-Duncan v. Horizon House Developmental Servs.*, 155 F. Supp. 2d 390, 396 (E.D. Pa. 2001). *See also Duffy Tool & Stamping, LLC v. NLRB*, 233 F.3d 995, 998 (7th Cir. 2000) ("By

out of work, no functioning bargaining unit in place, and the Union rendered powerless by Respondent's violations while the administrative process plays out, employees will lose confidence in the Union's ability to prevent unlawful changes to their employment terms or otherwise effectively represent them.[114]

The risk of irreparable harm is particularly acute where, as here, the Union is newly certified and seeking to lay the foundation for future negotiations by bargaining a first contract with Respondent. It is well recognized that unions in that position are highly vulnerable to employer misconduct and that illegal interference with the employees' freely chosen representative warrants the protections of Section 10(j) relief.[115] In addition, an interim order requiring Respondent to bargain over any changes will prevent the loss of the benefits of good-faith collective bargaining and representation by their chosen Union over serious matters affecting their

---

undermining support for the union, the employer positions himself to stiffen his demands … knowing that if the process breaks down the union may be unable to muster enough votes to call a strike.").

[114] *See, e.g., Vibra Screw*, 904 F.2d at 878-79 (Section 10(j) injunction is necessary "when the nature of the alleged unfair labor practices are likely to jeopardize the integrity of the bargaining process and thereby make it impossible or not feasible to restore or preserve the status quo pending litigation" including where "the chilling effect of management retaliation may outlast the curative effects of any remedial action the Board might take including reinstating illegally discharged workers"); *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 49-50 (1987) (an employer's failure to bargain "'disrupts the employees' morale, deters their organizational activities, and discourages their membership in unions.'") (quoting *Franks Bros.*, 321 U.S. at 704); *Citizens Publishing & Printing Co. v. NLRB*, 263 F.3d 224, 233 (3d Cir. 2001) (illegal change "'minimizes the influence of organized bargaining' and emphasizes to employees 'that there is no necessity for a collective bargaining agent.'") (quoting *May Dep't Stores Co. v. NLRB*, 326 U.S. 376, 385 (1945)).

[115] *See, e.g., Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 501 (7th Cir. 2008) (risk of irreparable harm to union's status "particularly true" in cases involving "fledgling," recently-certified unions); *Arlook v. S. Lichtenberg & Co., Inc.*, 952 F.2d 367, 373 (11th Cir. 1992) ("The [u]nion was only recently certified by the Board and the employees were bargaining for their first contract. These two facts make bargaining units highly susceptible to management misconduct.").

continued employment.[116] And, perhaps most significantly in this case, it will not allow Respondent to permanently sever the bargaining relationship or avoid its bargaining obligation with its employees' chosen bargaining representative.

The other proposed injunctive relief is also equitably necessary. A broad cease-and-desist order is appropriate to prevent further violations because Respondent has engaged in egregious misconduct "demonstrat[ing] a general disregard for the employees' fundamental statutory rights."[117] Also, a public reading of the district court's order in front of the employees by a Respondent official or a Board agent is an "effective but *moderate* way to let in a warming wind of information and, more important, reassurance."[118] Relatedly, posting the court's order during the pendency of the administrative proceedings, along with the electronic distribution of the order, will further inform the unit employees that they are free to exercise their statutory right to support the Union without fear of retaliation.[119]

---

[116] *See Chester*, 666 F.3d at 103 (quoting *Bloedorn*, 276 F.3d at 299); *Small*, 661 F.3d at 1191–92; *Frankl I*, 650 F.3d at 1363; *Gitano Group*, 730 F. Supp. at 625. *See also Dupont Specialty Products, USA*, 369 NLRB No. 117, slip op. at 19-20.

[117] *Frankl v. HTH Corp. (Frankl II)*, 693 F.3d 1051, 1061 (9th Cir. 2012) (cleaned up); *Angle*, 382 F.2d at 657-58, 660-61.

[118] *United Nurses Assocs. of Cal. v. NLRB*, 871 F.3d 767, 788-89 (9th Cir. 2017); *see also Goonan v. Amerinox Processing, Inc.*, 2021 WL 2948052, at *9 (D.N.J. July 14, 2021) (ordering notice reading); *Norelli v. HTH Corp.*, 699 F. Supp. 2d 1176, 1206-07 (D. Haw. 2010) (ordering reading of court order), *aff'd*, 650 F.3d 1334 (9th Cir. 2011); *Overstreet v. One Call Locators Ltd.*, 46 F. Supp. 3d 918, 932 (D. Ariz. 2014) (ordering notice reading as part of 10(j) relief); *Overstreet v. David Saxe Prods., LLC*, 2019 WL 332406, at *18 (D. Nev. Jan. 24, 2019); *Garcia v. Sacramento Coca-Cola Bottling Co., Inc.*, 733 F. Supp. 2d 1201, 1218 (E.D. Cal. 2010); *Rubin v. Vista del Sol Health Services, Inc.*, 2015 WL 306292, at *2 (C.D. Cal. Jan. 22, 2015).

[119] *See, e.g.*, *Goonan*, 2021 WL 2948052, at *9 (ordering posting); *Sacks v. I.N.S.A., Inc.*, 2024 WL 2187012, at *9 (D. Mass. May 14, 2024) (affirmative provisions 2(d) & (e), ordering physical posting and electronic distribution of court's order); *Coffman v. UPS Supply Chain Solutions*, 2024 WL 36174, at *10 (E.D. Cal. Jan. 3, 2024) (same); *Hooks v. Ozburn-Hessey Logistics, LLC*, 775 F. Supp. 2d 1029, 1054 (W.D. Tenn. 2011) (ordering posting).

### C. *The Balance of Equities Strongly Favors Temporary Injunctive Relief*

The balance of equities strongly favors the grant of interim injunctive relief. In balancing the equities, "the district court must take into account the probability that declining to issue the injunction will permit the alleged unfair labor practice to reach fruition and thereby render meaningless the [NLRB's] remedial authority."[120] Absent interim relief, the employees and the Union will suffer the irreparable harms described above. In contrast, there is little harm to Respondent from requiring it to bargain with the Union in good faith to an agreement or a bona fide impasse over any proposed changes. An interim bargaining order under Section 10(j) is not permanent.[121] The order would not compel agreement to any specific term or condition of employment advanced by the Union in negotiations. Moreover, any agreement reached by the parties under a Section 10(j) order can contain a condition subsequent to take into account the possibility that the Board ultimately refuses to grant a bargaining order remedy.[122] While collective bargaining entails costs in terms of time and money spent, this burden will fall upon both

---

[120] *Sullivan*, 2025 WL 40086, at *17 (quoting *Small*, 661 F.3d at 1196).

[121] *See Seeler v. Trading Port, Inc.*, 517 F.2d 33, 40 (2d Cir. 1975) ("there is nothing permanent about any bargaining order . . . particularly an interim order which will last only until the final Board decision").

[122] *See, e.g., Kendellen v. Evergreen Am. Corp.*, 428 F. Supp. 2d 243, 252 (D.N.J. 2006) (interim bargaining order will not "impose significant burdens" on employer because "any contract can be made subject to rescission in the event that the Board" determines that the employer "acted lawfully"); *Gitano Grp.*, 730 F. Supp. at 625 (noting that respondent "may insist as a condition of reaching agreement under the § 10(j) injunction that any labor contract" covering its facility "may be contingent upon the Board upholding its asserted unit determination"); *see also Small*, 661 F.3d at 1198 n.23 (parties "would be bargaining with knowledge of the [Board's] continuing proceedings" and "any agreements could provide for an exception" if the Board ultimately ruled for the employer); *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 28 (1st Cir. 1986) (employer "can condition the continued efficacy of an agreement" reached pursuant to an interim bargaining order "upon the final disposition of the Board"); *Kaynard*, 625 F.2d at 1054 (observing that "any agreement can contain a condition subsequent to take into account the possibility" that the Board may reject a Regional Director's unit determination and "create a somewhat anomalous situation").

Respondent and the Union and, therefore, does not defeat a request for an order requiring interim bargaining.[123]

In balancing the need for interim reinstatement, it is well settled that the Section 7 rights of alleged discriminatees to interim reinstatement under Section 10(j) outweigh the job rights of the workers hired or reassigned to replace them.[124] Any harm Respondent might suffer as a result of a temporary injunction "will only last until the Board's final determination"[125] and in the interim, Respondent will receive the services of the experienced employees. Relatedly, Respondent has represented that its contracts with US Medical and Clipboard allows it the flexibility to hire as many contract nurses as it needs, and thus there is no risk of a penalty for breach when restoring the work to the unit.[126] (T. 338-339) Nor will interim reinstatement restrict Respondent's right to discipline its employees in a nondiscriminatory fashion where appropriate.[127] Further, an interim cease-and-desist order would require Respondent to merely obey the law while the administrative case is processed. Accordingly, the balance of equities tips sharply in the Board's favor.

### D. Temporary Injunctive Relief Here Serves the Public Interest

---

[123] *See Small,* 661 F.3d at 1196; *Kaynard*, 625 F.2d at 1054.

[124] *See Aguayo v. Tomco Carburetor Co.*, 853 F.2d 744, 750 (9th Cir. 1988) (citing *Maram v. Universidad Interamericana de Puerto Rico, Inc.*, 722 F.2d at 959-60 (1st Cir. 1983)), *overruled on other grounds*, *Miller v. Cal. Pac. Med. Ctr.*, 19 F.3d 449 (9th Cir. 1994) (en banc); *Bloedorn*, 276 F.3d at 299-300.

[125] *Pan Am. Grain Co.*, 805 F.2d at 28.

[126] *See, e.g.*, *Power, Inc.*, 311 NLRB 599, 600 (1993) (proper remedy following unlawful subcontracting is restoration of unit work unless respondent demonstrates restoration is unduly burdensome), enfd.*, 40 F.3d 409, 425 (D.C. Cir. 1994).

[127] *See Wellington Hall Nursing Home, Inc.*, 651 F.2d at 906; *Pye*, 238 F.3d at 75; *Electro-Voice*, 83 F.3d at 1573.

In Section 10(j) cases, the public interest is served by encouraging the "fundamental objective of our national labor relations legislation to promote wholesome and mutually acceptable labor relations and the settlement of labor disputes through collective bargaining between employees and their employer."[128] Thus, temporary injunctive relief in this case, including an interim bargaining order over any changes, restoration of the bargaining unit work, and offers of interim reinstatement to the unlawfully laid off unit employees would further the public interest by fostering the statutory policy in favor of collective bargaining to safeguard industrial peace.[129] Injunctive relief here will serve the purposes and policies of the Act by protecting employees' statutory right to designate "representatives of their own choosing" and by "encouraging the practice and procedure of collective bargaining."[130] Additionally, it will serve the public interest in "ensur[ing] that an unfair labor practice will not succeed" because of the long administrative

---

[128] *Eisenberg v. Hartz Mountain Corp.*, 519 F.2d 138, 142 (3d Cir. 1975). *See also Hirsch*, 147 F.3d at 247; *Vibra Screw*, 904 F.2d at 876.

[129] *See Wellington Hall Nursing Home*, 651 F.2d at 907; *Centro Medico del Turabo*, 900 F.2d at 445 ("If the goal of the labor laws and regulations is to strengthen the bargaining process, then ordering bargaining . . . cannot be contrary to the public interest."); *see also Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 211 (1964) (noting in case involving unlawful subcontracting of unit work that, "The Act was framed with an awareness that refusals to confer and negotiate had been one of the most prolific causes of industrial strife."); *Ford Motor Co. v. NLRB*, 441 U.S. 488, 499 (1979) ("National labor policy contemplates . . . collective bargaining. . . . this is preferable to allowing recurring disputes to fester outside the negotiation process until strikes or other forms of economic warfare occur."); *Paulsen v. Remington Lodging & Hospitality, LLC*, 773 F.3d 462, 469 (2d Cir. 2014) ("The principal purpose of a [Section] 10(j) injunction is to guard against harm to the collective bargaining rights of employees.").

[130] 29 U.S.C. § 151; *see also NLRB v. United States Steel Corp. (Amer. Bridge Div.)*, 278 F.2d 896, 900 n.10 (3d Cir. 1960).

process.[131] It is also plainly in the public interest to ensure that Respondent comply with federal labor law.[132]

In sum, interim relief ensures that Respondent does not profit from its illegal conduct, protects the employees' Section 7 rights, safeguards the parties' collective bargaining process, preserves the remedial power of the Board, and effectuates the will of Congress.

## VI.    CONCLUSION

The evidence of Respondent's efforts to chill its employees' support for the Union presents a clear illustration of the conduct contemplated by Congress when it enacted Section 10(j) – a course of conduct that, without injunctive relief, will enable Respondent to accomplish its unlawful purpose.  Petitioner urges the Court to preserve the public interest inherent in employee free choice and ensure the integrity of the Board's remedial authority by entering an injunction as requested in the Petition.

Dated at Philadelphia, Pennsylvania, this 7th day of August 2025.

Respectfully submitted,

/s/ Lea F. Alvo-Sadiky

_____

Lea F. Alvo-Sadiky
Counsel for Petitioner
National Labor Relations Board, Region 4
100 Penn Square East, Suite 403
Philadelphia, Pennsylvania 19107
Tele: (215) 597–7630
Lea.Alvo-Sadiky@nlrb.gov

---

[131] *Small*, 661 F.3d at 1197 (quoting *Frankl I*, 650 F.3d at 1365-66). *See also Seeler*, 517 F.2d at 39 (the public interest is in "prevent[ing] frustration of the purposes of the Act").

[132] *Small*, supra (citing *N.D. v. Haw. Dep't of Educ.*, 600 F.3d 1104, 1113 (9th Cir. 2010) ("[I]t is obvious that compliance with the law is in the public interest.")).