## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KIMBERLY E. ANDREWS, Regional Director of the    ;

Fourth Region of the NATIONAL LABOR    :

RELATIONS BOARD, for and on behalf of the    :

NATIONAL LABOR RELATIONS BOARD,    :

               **Petitioner,**    :     Civil No. 2:25-cv-04515

    **v.**    :

NEW VITAE, INC. d/b/a NEW VITAE WELLNESS    :

AND RECOVERY,    :

              **Respondent**    :

## RESPONSE TO PETITION FOR INJUNCTION UNDER SECTION 10(j) OF THE NATIONAL LABOR RELATIONS ACT, AS AMENDED

The Respondent hereby responds to the Petition for injunction in this matter, in seriatum, as follows:

1. Admitted.

2. The averments stated in this paragraph are conclusions of law to which no responsive pleading is required. To the extent the averments state alleged facts, the Respondent denies those facts.

3. (a) through (o). Admitted.

4. Admitted.

5. Admitted.

6. Admitted.

7. Denied. The averments stated in this paragraph are conclusions of law to which no responsive pleading is required. To the extent the averments state alleged facts, the Respondent denies those facts.

   a. Admitted.

   b. Admitted.

   c. Admitted.

   d. Admitted.

   e. Admitted.

   f. Admitted.

   g. Admitted.

   h. Admitted.

   i. Admitted.

   j. (i) Admitted in part. Denied in part. Respondent admits that it laid off employees. Respondent denies the alleged date of said layoffs, which occurred on or about November 7, 2024, AFTER Respondent offered to bargain with the union over when, if, and how such layoffs would occur.

      (ii) Admitted.

      (iii) Denied.

      (iv) The averments stated in this paragraph are conclusions of law to which no responsive pleading is required. To the extent the averments state alleged facts, the Respondent denies those facts.

      (v) Denied.

k. The averments stated in this paragraph are conclusions of law to which no responsive pleading is required. To the extent the averments state alleged facts, the Respondent denies those facts.

l. Denied.

m. The averments stated in this paragraph are conclusions of law to which no responsive pleading is required. To the extent the averments state alleged facts, the Respondent denies those facts.

8. Denied.

9. Denied.

10. Denied.

11. Denied.

12. Denied.

13. Denied.

14. Denied.

15. Denied.

16. Denied.

WHEREFORE, Respondent prays this Honorable Court deny the instant Petition.

Respectfully submitted,

Guy Vilim
Atty. ID #42633
The Law Office of Guy Vilim, LLC
11 South Olive Street, 2nd Floor
Media, PA 19063
(610)-566-0711
gvilim@vilimlaw.com

3

CERTIFICATE OF SERVICE

I, Guy Vilim, hereby certify that on this 15th day of September, 2025, our Response to

Petition for Injunction Under Section 10(j) of the National Labor Relations Act, as Amended, has

been served on the following counsel via electronic mail and through the Court's e-filing system:


Lea F. Alvo-Sadiky
National Labor Relations Board, Region Four
The Wanamaker Building
100 East Penn Square, Suite 403
Philadelphia, Pennsylvania 19107


Respectfully submitted,

Guy Vilim
Atty ID #42633
The Law Office of Guy Vilim, LLC
11 South Olive Street, 2nd Floor
Media, PA 19063
(610)-566-0711
gvilim@vilimlaw.com

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KIMBERLY E. ANDREWS, Regional Director of the ;

Fourth Region of the NATIONAL LABOR :

RELATIONS BOARD, for and on behalf of the :

NATIONAL LABOR RELATIONS BOARD, :

                Petitioner, :     Civil No. 2:25-cv-04515

   v. :

NEW VITAE, INC. d/b/a NEW VITAE WELLNESS :

AND RECOVERY, :

              Respondent :

## RESPONDENT'S MEMORANDUM OF LAW IN SUPPORT OF RESPONSE TO PETITION FOR INJUNCTION

      This matter comes before the Court pursuant to a Petition for Injunction filed by the Regional Director of the Fourth Region of the National Labor Relations Board. The Respondent is a corporation providing medical treatment and residential care to mentally disabled persons in three locations in Philadelphia. Some of the employees of those three locations are nurses represented by a union commonly known as "1199(c)." In her Petition, the Director seeks preliminary or temporary injunctive relief pursuant to Section 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j). In support of her Petition, the Director alleges that the Respondent violated section 10(j) when it laid off union member employees, "without prior notice to the Union, and without affording the union an opportunity to bargain with Respondent with respect to this conduct." Petition for Injunction at paragraph 7.j.(v). This

quoted statement is false. On the contrary, prior to laying off any employees, the Respondent met with and offered to bargain over the issue of layoffs, including how, when, or even if those layoffs would occur.  In response, the union terminated all bargaining, walked away from the bargaining table, and refused, for more than ten months, to make any counter proposal or other offer to meet and engage in bargaining.  Instead, the union has ignored its obligation to bargain and relied on the Regional Office to obtain through litigation what it should seek through good faith bargaining.  Unfortunately, and improperly, the Regional Director has cooperated with this circumvention of the union's bargaining obligation up to an including the filing of the instant Petition.  As the Petition rests on a foundation of false facts, it should be denied as lacking merit.

The parties do not disagree as to the basic principles of law that govern the Court's consideration of the instant Petition.  See Petitioner's <u>Memorandum of Points and Authorities</u> at page 5.  As noted by the Petitioner, she may only prevail here if she establishes four elements: a likelihood of success on the merits in the administrative proceedings currently pending before the NLRB,[1] and; the existence of irreparable harm if the Court denies preliminary injunctive relief; and; that the balance of equities weighs in favor of the Petitioner and the Respondent will suffer no undue hardship if the Court grants injunctive relief sought, and; that granting the relief sought is in the public interest.  Failure by the Petitioner to establish any one of these factors is fatal to her Petition.  Here, the Petitioner fails to establish any of the four required elements and, consequently, the Court must deny the Petition.

The Petitioner fails to demonstrate a likelihood of success on the merits.  The sole issue raised in the Petition is the question of whether the Respondent laid off union members in early

---

[1] The parties are currently engaged in administrative proceedings and have created a factual record and briefs therein.  A copy of Respondent's Post Hearing Brief in that proceedings is attached hereto as Exhibit 1 and incorporated herein as if set forth in full here.

November, 2024, "without prior notice to the Union, and without affording the Union an opportunity to bargain with Respondent with respect to this conduct." If this factual assertion is true, then the Respondent committed an unfair labor practice and violated its obligation for bargain over the layoffs in good faith under Section 10(j). However, the assertion is not true and the facts in this matter completely and unambiguously contradict the assertion. As briefed before the NLRB administrative judge, what the record really shows is that the Respondent did attempt to bargain in good faith over the issue of layoffs. Specifically, the record shows that as of November 1, 2024, the Respondent and union were engaged in bargaining over a union contract. Those negotiations were scheduled to resume on November 1, 2024. As scheduled, the parties met for this purpose at the union headquarters in Philadelphia. At the beginning of the meeting, the Respondent informed the union bargaining team that it had formulated a business plan under which it would provide nurses at its Philadelphia programs through the use of staffing agencies.[2] The use of such "contract nurses" was not new and was a practice that had begun years before the union was certified as representative of the program's nurses. That practice had continued, without complaint from the union, for the entire time the union was certified as representative, a period of approximately eighteen months. As it had been implemented through all this time, the use of "contract nurses" had consistently meant that half (and sometimes ALL) of the nurses working a particular shift were contract nurses. As part of its proposed plan, the Respondent informed that union that all employee nurses would be laid off. Having stated its plan, the Respondent invited a response.

---

[2] Uncontested evidence at the administrative hearing demonstrated that the reason for formulating this plan was that the Respondent had negotiated lower payment rates for contract nurses and that it could realize hundreds of thousands of dollars per year of cost savings. As a provider whose operations are funded almost entirely by federal and state Medicaid funds, achieving such savings was very significant.

Instead of providing any response, the union abruptly terminated the bargaining session and, quite literally, threw the Respondent's representatives out of the office. To date, although the Respondent was fully prepared to bargain over its the proposed plan, the union has steadfastly refused to provide any counter proposal or to propose a meeting date to resume bargaining. For its part, the Respondent has stood ready to meet and resume bargaining at any time. Instead of bargaining, as is its obligation under the NLRA, the union filed an unfair labor practice charge on or about November 4, 2024, and has looked to the Petitioner to achieve through litigation what should be bargaining for at the table. On or about November 7, 2024, in light of the union's refusal to bargain, the Respondent implemented its layoff plan.

It is not unlawful for an employer to lay off employees. It is not unlawful for an employer to fill its need for staff through the use of contract staffing agencies. If, as here, a union has been certified as a collective bargaining representative for some employees, it is only a violation of Section 10(j) if an employer implements either of these actions without first providing the union with notice of the plan and the opportunity to bargain over the plan. That is precisely what the Respondent did here: in a formal bargaining session, it met with and offered the plan to the union with every expectation that the union would object and then offer some counter proposal. This never happened because, and only because, the union decided that it could have the Reginal Director circumvent the bargaining structure mandated by the NLRA, up to and including coming to this Court to achieve everything for the union that the union could have desired from negotiations, without the bother of actually bargaining. In the end, the actions of the Respondent did not violate the NLRA in any way connected with the issue of layoffs or the use of contract staff. Based on this record, the Petitioner cannot and does not establish a likelihood of success on the merits and the Court must deny the instant Petition.

4

There is no irreparable harm established here. As the Petitioner correctly reports (see Memorandum of Points at page 6), irreparable harm can be shown if the record is supported by a refusal of one party to bargain in good faith. Here, however, there is no evidence of such a refusal by the Respondent who, as noted previously, came to the bargaining table on November 1, 2024, **before implementing any layoffs**, expressly for the purpose of engaging in the give and take of collective bargaining over the issue. It was the union, not the Respondent, who terminated those discussions and who has refused to respond in any way other than to seek the aid of the Regional Director. To the extent that there is any desire by the union to renew bargaining today, or tomorrow, or at any time, the Respondent will meet and will bargain in good faith. There is simply no need for Court intervention to accomplish this.[3]

The Petitioner also fails to show that the equities of granting preliminary relief weighs in favor of the National Labor Relations Board. Quite the contrary, in this matter, imposing the relief sought by the Petitioner will have a devastating effect on the ability of the Respondent to continue providing the care and treatment that patients receive in its Philadelphia facilities. Specifically, the Petitioner seeks an order from this Court that it cease and desist from, "subcontracting bargaining unit work." Petition at page 11, Prayer for Relief paragraph 1(b). As the record in the underlying administrative proceeding demonstrated, the Respondent has always relied heavily on contract nurses to fill its nursing shifts, sometimes partly and sometimes fully. This reliance and the practice of using contract nurses preceded the union's presence in the workplace and continued without issue or complaint thereafter. If the Respondent was now prohibited from using contract nurses and had to rely only on employee nurses, it could not fill

---

[3] If the union wishes to resume bargaining, and if there was a genuine concern about the Respondent's good faith, the parties could always seek the assistance and mediation of the Federal Mediation Service to preside over such bargaining, again, obviating the need for the Court to issue temporary injunctive relief. See https://www.fmcs.gov

the need for nurses on many shifts, thus crippling its ability to continue operations.  In the end, determining how contracting should work and whether contract staff or employee staff are required should be left to the parties to decide through bargaining.  It should not be the place of the Regional Director nor, with all due respect, the Court, to allow the union or the Petitioner to ignore the obligatory bargaining required by the NLRA.  As the balance of equities in this matter clearly weighs in favor of the Respondent, the Petitioner fails to establish that it should prevail here and the Court must deny the instant Petition.

Likewise, the injunction sought by the Petitioner is not in the public interest.  Specifically, the relief sought would deprive the Respondent of the opportunity to complete the bargaining that the parties had begun and that the Respondent tried to continue on November 1, 2024, and in the days after.  Thus, it is actually the Respondent who is being deprived of the rights assured by the NLRA. Ending that denial, not the artificial one asserted in the Petition, is what best serves the public interest.  Furthermore, the relief requested by the Petitioner would, if granted, likely preclude the ongoing operation of the Respondent's Philadelphia treatment facilities, at least partially, for a lack of available nurses.[4]  Doing so will deprive the Philadelphia community, including its criminal justice system, of vital resources to manage and treat persons with serious mental illness.  That deprivation would surely be contrary to the public interest.

---

[4] As described in the record before the administrative law judge, the facilities at issue here are known as residential Treatment Facilities for Adults ("RTFA"), which provide medical and psychiatric treatment for persons with behavioral  health diagnoses (mental illness), many of whom are referred from the criminal justice system and many f whom are not permitted to leave the facility without supervision d permission.

As the Petitioner has failed to establish the four elements required to prevail in its Petition, this Court must deny the Petition.

Respectfully submitted,

Guy Vilim
Atty. ID. #42633
The Law Office of Guy Vilim, LLC
11 South Olive Street, 2nd Floor
Media, PA 19063
(610)-566-0711
gvilim@vilimlaw.com

7

**UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 04**

NEW VITAE, INC. d/b/a NEW VITAE WELLNESS
AND RECOVERY
and                                                Cases 04-CA-324629
                                                            04-CA-328382
                                                            04-CA-328762
                                                            04-CA-347986
                                                            04-CA-354024

DISTRICT 1199C, NATIONAL UNION OF
HOSPITAL AND HEALTH CARE EMPLOYEES,
AFSCME, AFL-CIO

<u>**RESPONDENT'S POST HEARING BRIEF**</u>

**Brief**

In its Complaint, General counsel alleges the following unlawful acts by the Respondent:

1. On May 4, 2023, Respondent suspended a bargaining unit member named Danita Alexander because of her actions in support of the Union.  Complaint at ¶7.

2. Between May 5 and May 8, 2023, Respondent withheld pay from Danita Alexander because of her actions in support of the Union.  Complaint at ¶7.

3. Between May 1, 2023 and October 25, 2023, Respondent reduced Danita Alexander's work hours because of her actions in support of the Union.  Complaint at ¶7.

4. On or about August 21, 2023, Respondent gave Danita Alexander a negative performance review because of her actions in support of the Union.  Complaint at ¶7.

5. On October 25, 2023, the Respondent terminated Danita Alexander's employment because of her actions in support of the Union.  Complaint at ¶7.

6. On or about November 1, 2024, the Respondent laid off all bargaining unit members because the members had joined a union.  Complaint at ¶8.

1

*Exh. 1*

7. The Respondent subcontracted work previously performed by bargaining unit members because the members joined a union. Complaint at ¶8.

8. Between May 9, 2023, and October 31, 2023, the Respondent unreasonably delayed providing the union with information requested on May 9, 2023. Complaint at ¶9.

9. From June 27, 2024, through October 3, 2024, the Respondent unreasonably delayed providing the Union with information requested on June 27, 2024. Complaint at ¶9.

10. The Respondent refused to provide the Union with the names of bargaining unit employees who participated in "stay interviews." Complaint at ¶10.

11. The Respondent has refused to provide the Union with "information as to the Employer's reasoning/basis for the decision to subcontract bargaining unit work in its entirety." Complaint at ¶10.

12. From May 9, 2023, until October 10, 2024, the Respondent refused to bargain with the Union. Complaint at ¶11.

13. From November 1, 2024, until the present, the Respondent has refused to bargain with the Union. Complaint at ¶11.

14. The Respondent failed to give bargaining unit members a "holiday bonus." Complaint at ¶12.

15. In January 2024, the Respondent failed to give bargaining unit members a wage increase. Complaint at ¶12.

As will be demonstrated below, the facts and applicable law do not support these allegations as unfair labor practices.

**FACTS RELEVANT TO ALLEGATIONS 1 THROUGH 5**

2

The first five allegations listed above relate to former employee and former bargaining unit member Danita Alexander. The Employer contends that Ms. Alexander's history as an employee was always driven by her own conduct, which included an accumulation over time of events that displayed a clear penchant for creating disruption and conflict in the workplace, including, most seriously, telling other staff on duty that video footage inside the Employer's programs had been altered or deleted and that official reports of problematic issues with patients were being either falsified or inaccurately submitted to government funders and licensing entities. When, in October 2024, it became clear that Ms. Alexander was unable or unwilling to change her behavior, and when a patient reported feeling bullied by her and unwilling to receive services from her, and when several other co-workers reported the same bullying behaviors by Ms. Alexander, the Respondent terminated her. Notably, as to the Union's allegation that her termination was in retaliation for her protected activities, the Employer notes that eight nurses, including Ms. Alexander, signed a letter outlining workplace complaints on September 29, 2023. See Exhibit 1. Presumably, all eight of those were involved in some degree or another in subsequent unionization activities, yet six remained employed for more than a year following Ms. Alexander's termination; only Ms. Alexander and one other nurse were terminated among the eight. The Respondent proffers the following as proposed Findings of Fact related to issues numbers 1 through 5.

1. Initially, the Respondent incorporates its Answer to the Complaint in this matter as if said answer was repeated in full here.

2. The Employer operates and provides a range of programs intended to treat and support persons with disabilities, especially mental and cognitive disabilities. Tr. at 330. The programs at issue here are residential programs located in Philadelphia. *Id.* These programs primarily serve residents who are receiving treatment for a diagnosed

3

mental illness, and who are, or recently have been, connected to the criminal justice system in Philadelphia. *Id.* at pp. 329, 332. These patients have been released from incarceration or hospitalization but still require monitoring and treatment services to aid them in transitioning successfully to community living. Id. at 332-3. The buildings that house the New Vitae patients are armed with alarms and residents do not have the freedom to leave the program without authorization. Id. at 333.

These programs are funded almost entirely through government funding mechanisms such as Medicaid and are licensed by and closely regulated by the Commonwealth of Pennsylvania, and the City of Philadelphia. Id. at 330-332. Nurses are part of the staff who work in the residences. Id. at 330.

On or about January 19, 2023, the Union filed an RC Petition with the NLRB (Petition 04-RC-310585) seeking to organize and represent the nurses working in these Philadelphia programs and the Union was certified on May 5, 2023. Complaint at ¶5(b). Until it learned of the Petition, the Employer was unaware of any Union-related activity by its Employees. Tr. at p. 39-40.

Well before January 2023, and as far back as January 2022, the Employer began planning for an outside consultant to conduct "Stay Interviews," the purpose of which was to allow employees to evaluate their employment experience, good, bad, or otherwise. See GC-50 at p. 4, which is a planning document for the stay interview process development with a note/comment dated January 25, 2022, approximately one full year before the Union Petition was filed or certified. *Id.*

The Union ultimately prevailed in an election and was certified as the collecting bargaining representative for registered nurses working in the residential programs operated by the Respondent in Philadelphia. Complaint at ¶5(a). By that time, the Employer had completed

4

development of the Stay Interview process, and those interviews were well underway in various

parts of the agency, including in the programs where the nurses worked in Philadelphia. GC-50

at p. 4. Specifically, stay interviews at various parts of the Employer's operation (including

inside and outside of its Philadelphia programs) began in 2022 and continue today. *Id*. The stay

interview process was in no way connected to the union petition, election, or any protected

activity. *Id*. At all times, participation in the stay interviews was voluntary and these interviews

were not in any way intended to have any effect on any employee's terms and conditions of

employment. Tr. at 223, 228. If employees chose to participate in the interviews, they were free

to provide any responses they chose to questions asked. *Id*. at 228. The Employer anticipated

that, like exit interviews for departing employees, these stay interviews would produce

information that was positive or negative or neutral about the workplace, as the interviewee

chose. GC-50.

Danita Alexander participated in a stay interview on April 21, 2023. Ex. GC-41(b).

During her interview, Ms. Alexander registered complaints of favoritism/nepotism in the

workplace, retaliation for union related activity, and improper or inadequate conflict resolution

mechanisms. *Id*. Notably, she did not register any complaint of concern about the alteration of

video footage that might have shown a resident/patient absconding without authorization from

the program where she worked. *Id*. Nor did she register or report any concerns about official

reports to government oversight agencies being improperly or inaccurately filed. *Id*. Similarly,

she never brought such issues to the attention of her supervisors or anyone else in management.

What she did do was make those kinds of allegations to co-workers, who then reported her

allegations to management. Tr. at 377

It is important to note here that allegations that staff in this kind of program have deleted

or altered video footage showing a patient elopement or escape from the program are incredibly

serious. Tr. at 334-5. So are allegations that reports to government oversight entities are improperly filed or inaccurate. *Id*. Either, and certainly both, if verified, could result in the immediate closure of the program and a loss of the Employer's operating licenses. *Id*. When these allegations surfaced, the Employer made an immediate decision to investigate them promptly, aggressively, and transparently. *Id*. at 336. As her coworkers reported that Ms. Alexander was the source of the allegations, the first step in that investigation was to interview Ms. Alexander immediately. *Id*. at 378-9. Management made several attempts to schedule a meeting for this purpose and, given the seriousness of the allegations and Ms. Alexander's apparent failure to report them to management herself, if they were made in good faith, the Employer advised Ms. Alexander to invite a union representative to attend with her if she wanted. *Id*. at 379; GC-54(a) at p. 5-6. When, after some time, Ms. Alexander declined to meet with the Employer, and given the urgent need to investigate the allegations, the Employer notified Ms. Alexander that she would not be permitted to work shifts until she agreed to meet. Tr. at 379; GC-54(a) at p. 5. This determination was made by upper level management of the Employer and was made, responsibly, solely for the purpose of compelling Ms. Alexander to provide facts, if there were any, to substantiate allegations of video and/or document falsification within the program. *Id*.

      This determination worked and a meeting to review the allegations, as well as the other concerns she had voiced during her stay interview, occurred on May 8, 2023. Ex. GC-51. Paul Grubb, a representative of the Union, attended the meeting. *Id*. When asked about the allegations, Ms. Alexander responded in what was by then a familiar pattern – she claimed that it was "other people" who made the allegations and were spreading them around the workplace and that she could "only state what other staff members were saying," but that "other staff" were saying that the footage was tampered with." GC-51 at p. 2. This assertion was, of course,

contrary to the initial report provided to the Employer, in which co-workers cited Ms. Alexander as the source of the rumors regarding altered or improper video and records. Tr. at 377.

At the conclusion of the meeting, the Employer advised Ms. Alexander not to discuss the issues raised with other employees while the investigation remained open. GC-52. The Employer confirmed this prohibition in an email to Ms. Alexander on May 16, 2023. *Id*. Along with this restriction, the Employer also confirmed that Ms. Alexander was free to discuss the meeting and the issues raised with her Union representative in case the prohibition might be seen to implicate any protected activity. *Id*. At the conclusion of the meeting on May 8, 2023, Ms. Alexander was restored to her normal status and was permitted to resume working. Tr. at 379; GC-51.

Ultimately, the Employer reviewed and further investigated the concerns and allegations discussed on May 8th and, principally, found no evidence to support allegations that any video had been altered or deleted, or that any reports had been improperly filed or falsified. Tr. at 379. The Employer did find that some of Ms. Alexander's complaints warranted some operational changes, but never went back to discipline Ms. Alexander for what could have been justifiably characterized as the spreading of false and malicious allegations of serious unlawful activity with no foundation or basis in fact. Tr. at 380. The spreading of such allegations, in bad faith, could have warranted significant discipline, but, at this time, the Employer refrained from taking that course of action. GC-41(a). Instead, Ms. Alexander resumed her normal work. Tr. at 379.

In connection with its representation of Ms. Alexander in these events, the Union representative who attended the meeting on May 8th submitted a series of questions, all of which were responded to by the Employer via email on May 25, 2023. GC-41(a). In all of these actions, the Employer behaved appropriately under the circumstances and was, at all times, respectful of Ms. Alexander's status as a bargaining unit member. *Id*. Other than temporarily

denying her work in order to compel her attendance at the meeting that eventually took place on May 8, 2023, it imposed no sanction or discipline on her even though a justification might have existed to do so. *Id*. Even the temporary prohibition imposed on her to refrain from discussing the ongoing investigation respected her right to Union representation and was completely consistent with governing law. Ex. GC-52; See Apogee Retail, LLC , 368 NLRB No. 144 (2019).

Similarly, the allegation that Ms. Alexander received a negative performance review in June, 2023, lacks any basis in fact. GC-32(a). It is true that among a number of performance categories, Ms. Alexander received an initial low rating of "2" in one category. *Id*. This rating was based on specific and identifiable events that justified lowering her score, in the opinion of the team that gave the evaluation. GC-33. However, when Ms. Alexander complained about the score, management at the Employer changed the scores and elevated them to "3," once again in an effort to mollify Ms. Alexander and keep the peace. Tr. at 304. Ms. Alexander suffered no adverse employment action as a result of the evaluation process.

Following the resolution of the performance evaluation issue, Ms. Alexander continued a pattern of creating conflict between herself and her coworkers, prompting no fewer than four coworkers to report such behavior. Tr. at pp. 292, 297. The Employer gave credence to these complaints and decided that Ms. Alexander was either unwilling or unable to work cooperatively with her coworkers and patients and made a decision to terminate her for violating the Respondent's established "no bullying" policy. Tr. at 298. At a meeting for this purpose, a representative of the union attended the meeting but abruptly terminated the meeting after only a few moments. Tr. at 298-299. As a result of this abrupt end, and only because of the union representative's decision to stop the meeting, no further discussion occurred regarding the basis for Ms. Alexander's termination. Tr. at 299-300.

8

The decision to terminate Ms. Alexander, when it finally came, was based entirely on Ms. Alexander's inability to change behavior that produced conflict with coworkers, supervisors, and patients in the Employer's program. *Id*. The decision to terminate her had nothing at all to do with any protected activity. *Id*. In the end, it was her bullying conduct in the workplace – unrelated to any union activity – that lead to her termination. *Id*. Ms. Alexander's termination for bullying was entirely consistent with the employer's prior disciplinary action of this conduct from nonunion members. Tr. at 284.

The Respondent's use of Contract Nurses represented a continuation of its long-standing practice that did not require bargaining as it did not represent a change in the Employer's practice. When the continuation of its practice resulted in layoffs, the Respondent did not refuse to bargain over the layoffs and, therefore, committed no unfair labor practice.

In this case, a certification election occurred on or about March 16, 2023. Tr. at 22. The Union prevailed in that election by a single vote. Following the election, the Employer pursued objections and appellate review of the election and its results. Before those reviews had concluded, on May 9, 2023, the Union submitted a letter requesting information regarding the bargaining unit. Ex. GC-2. Notably, in that letter, the union declared that it would like to begin bargaining but offered no dates for meetings nor any proposals for review or discussion. *Id*. Instead, the Union's letter made clear that it was seeking information in order to be ready to bargain when the time was appropriate. *Id*.

Appellate review of the election challenges continued through the summer of 2023 and finally concluded on or about August 16, 2023. Nine days later, and with no word or communication between the parties, the Union filed an unfair labor practice charge alleging that the Employer had refused to provide information and refused to bargain. See Original Charge in 04-CA324629. The Employer then responded on October 31, 2023, and provided the Union

with all information that the union had requested AND stated its readiness to begin bargaining immediately. Ex. GC-3(a) and (b). On November 2, 2023, when the Union had failed to respond, counsel for the Employer wrote again to the Union and stated, "I am writing because I emailed you earlier in the week sending you information pursuant to your information requests to New Vitae and to invite you to begin bargaining. GC-4. I am not pressing you, I just want to make sure my message did not get lost in the ether." *Id*. Later that same day, the Union responded, acknowledged the Employer's offer to begin bargaining and reported that, "We are putting together our bargaining team and I will let you know when we are available." *Id*.

This statement is significant in the context of this case because it reveals that, in fact, as of November 2, 2023, the Union was not prepared to bargain. *Id*. On the contrary, this statement serves as a clear admission that the union's allegation that the Employer refused to bargain was bogus as the Union had not even formed its bargaining team. Id. See also Tr. at pp. 122, 169-171. Viewed in this light, the letter dated May 9, 2023, cannot be understood as asserting the Union's readiness to actually bargain. *Id*. The fact is that, even six months later, in November 2023, the Union was still not ready. *Id*. For the same reason, the contention implicit in the filing of the first unfair labor practice charge (that the Union was ready to bargain but the Employer was delaying), is likewise bogus. Again, the fact is that, even two and one-half months after filing the charge, the Union was still not ready to sit down. Responding to this, on the same day, the Employer wrote back and said, "Great. As I said, no rush I am just checking in." Ex. GC-4. At this point, responsibility for any delay rested with the Union.

After the communication exchange on November 2, 2023, approximately thirty-nine days elapsed before the Union provided suggested dates to meet. Ex. GC-5. During that time, the Union never complained that any requested information had not been provided. *Id*. Rather, the Union wrote on December 11, 2023, and unilaterally proposed dates for bargaining. *Id*. The

Employer responded two days later, on December 13, 2023, and agreed to coordinate with the Employer's bargaining team and "let you know an agreeable date." *Id*. Most significantly, the email from the Employer also contained a proposal to modify the wage rates for bargaining unit employees, even in advance of reaching any other agreements. *Id*. After proposing the change in writing, the Employer concluded the email by stating that, "The Employer's plan is to include the wage increases in the first pay period after I receive your response." *Id*. At this point, although no dates for face-to-face bargaining had been set, it is clear that the Employer was offering concrete proposals and was, in fact, bargaining. Certainly, no rational review of these events could possibly conclude that the Employer was refusing to bargain. Nor was the Employer ignoring the Union's offer of bargaining dates. On the contrary, the Employer expected a vigorous exchange regarding the wage proposal, which would, logically, occur when the two sides communicated further about wages and sat down to do so.

However, after the Employer made its proposal to increase wages on December 13, 2023, the Union went entirely silent for nearly six months. Then, on June 6, 2024, it was the Employer's representative who re-opened communications and wrote to the Union's representative, stating, "It has been almost 6 months since I heard from you guys about bargaining for New Vitae. Where does that stand?" Ex. GC-6. Only after this prodding did a new representative for the Union begin seeking bargaining dates and responses to new information requests. Ex. GC-7(a). Thus, to the extent there has been any delay in bargaining, the large majority of that delay is the responsibility of the Union, not the Employer. While there were delays in responding to the bargaining offers beginning on June 27, 2023, the Employer responded and agreed to bargain in far less time than the time that elapsed between December 13, 2023 and June 27, 2024.

11

Specifically, the Union and Employer engaged actively in sharing information and scheduling bargaining beginning in mid-September, 2024. Ex. GC-8. The Employer responded to the Union's outstanding information requests on October 3, 2024, and the parties met and commenced bargaining on October 10, 2024. EX. GC-9(a); Tr. at 181. At that time, the Employer presented the Union with a detailed contract proposal addressing all non-economic subjects of bargaining. Tr. 182-183. The Union did the same at this bargaining session and the parties reached agreement on a number of subjects. *Id*. At the conclusion of the session, the parties scheduled a next bargaining session for October 24, 2024. Tr. at 184. On October 23, 2024, the Employer requested that the session be rescheduled and a date of November 1, 2024, was agreed. Tr. at 186.

At the bargaining session on November 1, 2024, the Employer proposed that it would utilize its existing practice of using outside staffing agencies to perform nursing duties. Tr. at 300-301. Specifically, the Employer proposed to expand the use of two independent staffing agencies that the Employer had historically used to supply nurses, including for several years before the Union was certified. *Id*. at 338-9. The Employer had consistently used both agencies during all the time that the Union was certified. *Id*. At the same time, the Employer proposed that, as a result of this expansion of contract nurses, all staff nurses would be laid off. Ex. GC-12. At that time, the Employer proposed severance arrangements for all nurses scheduled for layoffs. *Id*. Finally, the Employer proposed a one-week delay in making layoffs effective in order to allow the parties to bargain over its proposals. Ex. GC-36. Once the proposals were on the table, the Union representatives terminated the bargaining session in order to confer. Tr. at 300.

Over the course of the next few days, the parties exchanged information related to the practice of using nurses from staffing agencies. Ex. GC-14(a); Consistently, the Union argued

that the Employer had no right to continue its existing practice of using staffing agencies to supply nurses and the Employer offered to bargain in good faith over the future use of such nurses, but refused to abandon its established practice of unrestricted use of staffing agency nurses pending bargaining. *Id*.

During these exchanges, the Union refused to bargain over layoffs or severance terms or any other terms, stating that doing so was premature until the issue of how and when the Employer used staffing agency nurses was resolved. *Id*. For its part, the Employer stated unequivocally that it was prepared to bargain over layoffs and severance terms, the future use of contract nurses, and all other subjects, but that it would not abandon its established practice of using contract nurses instead of staff nurses at its discretion. *Id*. Faced with the Union's refusal to bargain, on November 7, 2024, the Employer implemented the layoff and severance terms it had proposed on November 1, 2024. Tr. at 263-4. Ultimately, the Employer has always had the right to use contract or staff nurses as it chose, and the exercise of that right in this matter represented no change in that right. Certainly, the Union has a right to bargain and attempt to alter that right, but it does not, simply by virtue of its certification as bargaining representative, have the right to unilaterally sweep away long-standing employment practices.

As the record in this matter demonstrates, the decision to expand the use of subcontracted nurses was a prudent business decision that promised to garner substantial savings for the Respondent. Ex. R-1; Tr. at 372-3. Achieving such savings is always a primary concern for an agency such as New Vitae, which is funded by public Medicaid dollars through a per diem rate system that rarely provides rate increases. Id.; Tr. at 331. As was noted here, the Respondent has operated the Philadelphia programs for almost ten years but has only received one rate increase in all that time. Tr. at 331, 352. During that time, of course, the cost of running the program increased and it was always incumbent on Respondent's upper level managers to seek out saving

13

wherever possible. Tr. at 352. That is exactly what they did here. Their search for savings was prompted by several significant events. First, the Philadelphia programs operated at a substantial loss in 2023. Tr. at 372. This, more than anything, prompted a search for savings. The search was further prompted by the fact that the Respondent received permission for the first time to use Licensed Practical Nurses ("LPN") in the Philadelphia programs in August 2023. Tr. at pp. 323, 371. Prior to receiving this permission, the Respondent had used only Registered nurses ("RN") in Philadelphia. LPNs earn less than RNs, thus, one saving the Respondent anticipated was lowered nursing costs through the expanded use of LPNs. Tr. at 323. LPNs were not included in the bargaining unit. *Id*. As the Respondent planned to use LPNs more, they also looked to outside staffing agencies to supply more nurses, both LPNs and RNs. Tr. at 371. This anticipated expansion of staffing agency nurses allowed the respondent to negotiate a lower payment rate with one of the outside agencies it used. Tr. at 301-303. Maribel Poretta negotiated this lower payment rate for all nurses in December 2023. Ex. 14(b). Based on all these events, the program needed to save money to eliminate an operating deficit, it received permission to use less costly LPNs, allowing it to save money, and the rate it would be paying for all nurses supplied by outside staffing agencies would be lower.

All of these factors prompted the Respondent, during 2024, to examine how the use of staffing agency nurses might achieve necessary cost savings. Tr. at 340. The Respondent's CEO, Judy Yanacek, initiated this examination with the Respondent's Vice President of Business Operations. *Id*. Ms. Yanecek chose to examine the effect of moving to subcontracted RNs because the RNs were the highest paid employees and, therefore, potentially offered the most promising group from which to derive savings. Tr. at 352, 368. Based on the analysis she conducted, Ms. Yanacek concluded that filling all nursing shifts with staffing agency nurses would produce annual savings of between $102,000 and $276,000. Tr. 342 – 348. The

14

Respondent considered that such savings, if achievable, would be "substantial" and "very significant," *id.*, amounting to as much as $1.3 million over a five-year period. Based on this analysis, Ms. Yanacek decided to move, as quickly as possible, to filling all nursing shifts through staffing agencies. Tr. at 367.

Doing so did not require any change in existing practices. The Respondent had always used staffing agency nurses in Philadelphia, dating back nearly ten years to when the programs first opened. Tr. at 337. During that time, the Respondent had the unrestricted right to use contract nurses or not. Tr. at 338-339. For much of the period leading up to this matter, the Respondent filled approximately fifty percent of its nursing shifts with subcontracted nurses. Tr. at 339. Prior to receiving permission to use LPNs in Philadelphia, all of these subcontracted nurses were RNs. Tr. at 371. This was the Respondent's practice before the union election and after it. In fact, there were days and nights during which *only* contract nurses staffed the Philadelphia programs. Tr. at 339. The practice was obvious to all of the nurses and other employees in Philadelphia, including all of the bargaining unit members from the date of the union certification, right up until November 1, 2024. Tr. at pp. 31, 91. Thus, the move to expand the use of subcontracted nurses did not represent a change in the existing practice, under which the Respondent could and did use subcontracted nurses to whatever degree it chose. Significantly, at no time before November 1, 2024, did the Union or anyone else complain about the practice. Tr. at 337 – 339.

**Argument**

General Counsel alleges that the Respondent disciplined and terminated Danita Alexander because of her support for the Union. These allegations rely upon an assertion that all of the actions under review occurred because the Respondent harbored an animus against the union and was motivated in its actions by this alleged animus. However, the evidence in this

case reveals no such animus nor any connection between the alleged animus and the actions related to Ms. Alexander. On the contrary, every action taken by the Respondent in connection with Ms. Alexander would have been taken for her or any other employee who behaved as she did. General Counsel's allegations in this regard are baseless and do not meet the General Counsel's burden of proof.

Consideration of this matter is governed by the Board's decision in <u>Wright Line</u>, 251 NLRB 1083 (1980) and its progeny. <u>See</u> <u>Intertape Polymer Corp.</u>, 372 NLRB No. 133 (2023). Those decisions set forth the analytical framework for deciding cases such as this, where General Counsel alleges that actions by an employer were motivated by anti-union animus. Under that framework, the General Counsel must first establish a prima facie case by proving three elements. First, General Counsel must prove that the employee engaged in activity protected by the NLRA such as union organizing, collective bargaining, or other concerted activities. Second, General Counsel must prove that the employer was aware of the employee's protected activity. Third, General Counsel must show that the protected activity was a motivating factor in the employer's adverse action. This third element can be shown through direct evidence of animus or inferred from circumstantial evidence. If, but only if, General Counsel establishes all three of these elements, the burden shifts to the employer to show that, as an affirmative defense, that it had a legitimate, non-discriminatory reason for the adverse action. Most commonly, the employer establishes this affirmative defense by showing that it would have taken the same action against the employee even if the employee had not engaged in protected activity.

Applying this framework to the issues related to Danita Alexander demonstrates that General Counsel has failed to establish a prima facie case and that, even if it has, all actions taken by the Respondent would have occurred regardless of any protected activity by Ms.

Alexander. Here Respondent does not contest that Ms. Alexander engaged in protected activity or that it was aware of that activity. Respondent does, however, deny that anti-union animus played any role in its actions and decisions affecting her employment. On the contrary, the Respondent acted at all times exactly as it would have if there had never been any protected activity. For example, all actions related to the issue of doctored video footage occurred only because Ms. Alexander spread a rumor that someone had tried to hide evidence of wrongdoing, thereby creating an urgent need for the Respondent to investigate to determine if someone on its premises was involved in some kind of a cover-up of a patient elopement. None of the actions would have occurred if Ms. Alexander had not spread the rumor or if she had cooperated with the Respondent's requests to meet and relate what she knew. The actions taken by the Respondent to deny her the ability to accept work hours until she attended a meeting, are exactly the same actions the Respondent would have taken with any employee who claimed to have knowledge of evidence tampering but who refused to be interviewed about that information.

The related allegation by General Counsel that the Respondent refused to meet or bargain about the video interview is simply unsupported by the evidence here. That evidence shows that the Respondent encouraged Ms. Alexander to bring a union representative to the interview meeting and that, in fact, Paul Grubb attended the interview.

The allegation by General Counsel that the Respondent gave Ms. Alexander a negative performance review is equally unsupported by the evidence. That evidence shows that Maribel Poretta, the Respondent's Human Resources Director, changed the evaluation to increase the rating at Ms. Alexander's request. Thus in this instance as well, General Counsel has alleged wrongdoing by the Respondent based on facts that simply do not exist.

Finally, when the Respondent terminated Ms. Alexander, it did so based on her violation of its anti-bullying policy, which protects co-workers and patients from demeaning treatment by

**17**

other employees. In Ms. Alexander's case, the complaints of bullying came from multiple co-workers and from at least one patient. These complaints were not initiated by the Respondent, they came to the Respondent independently and not in any way related to any protected activity by Ms. Alexander. Once the Respondent learned of the complaints and verified that they were credible, it terminated Ms. Alexander in exactly the same way it terminated several other employees for similar bad behavior. Thus, it is clear that the decision to terminate Ms. Alexander would have occurred based entirely on her own behavior and not in any way related to her protected activities. Under the framework of <u>Wright Line</u>, the Respondent has established an affirmative defense to the allegations against it and those allegations must be dismissed.

In its Complaint, General Counsel contends at paragraphs 12 and 13, that the Respondent refused to bargain with the union. These allegations ignore the facts. As the earlier recitation of those facts plainly demonstrates, the union delivered a pro forma demand to bargain in May, 2023, despite the fact that legal challenges to the validity of the certification election were still underway. After those legal challenges ended in August, 2023, the parties engaged in a series of messages regarding the start of bargaining. Up to and including December, 2023, it was primarily the Respondent who was urging the start of bargaining. As part of those exchanges, as late as November, 2023, the union admitted that it was still gathering its team and was not prepared to meet. Then, in December, 2023, when the union finally reported that it was ready to meet, the Respondent commenced bargaining by making an unconditional offer to increase wages for bargaining unit members. That offer was open, clear and unconditional -- it sought no conditions or givebacks by the union and it stated that, if the union agreed, the increases would be made effective in the first paychecks after the union approved, even before a full agreement was reached. Having made that proposal, and having commenced bargaining, the Respondent fully expected a swift and detailed exchange between the parties to allow implementation of the

18

Case 2:25-cv-04515-HB    Document 13    Filed 09/15/25    Page 30 of 36


proposed wage increase, and the scheduling of dates for further bargaining. Instead, for more than six months, the union remained silent, the wage increase was never approved or implemented and no further bargaining occurred. Finally, after months of silence from the union, it was again the Respondent who, in early June, 2024, reached out to the union to gauge their interest in bargaining. To allege, as the General Counsel does here, that the Respondent refused to bargain until October 10, 2024, simply ignores reality and the uncontested evidence to the contrary.

Similarly, the assertion that the Respondent has refused to bargain since November 1, 2023, lacks any basis in reality and any support in the evidence. November 1, 2024, was the last date on which the parties met to bargain. At that meeting, the Respondent offered a proposal that would lead to the layoff and severance for all unit members. It is uncontested that this was a bargaining meeting. It is likewise uncontested that the union terminated the meeting without responding, and without offering any kind of counterproposals. Since that meeting, the Respondent has always offered to bargain on all subjects and it is the union who has refused to meet or to exchange any proposals that might lead to an agreement. Instead of bargaining in good faith, the union insists stubbornly that the Respondent is not permitted to use subcontracted nurses unless and until the union agrees, and it has refused to come to the table unless and until the Respondent abandons its established rights to subcontract. In response, the Respondent here has offered to bargain over a change in the future use of such nurses, but has denied the power of the union to alter the Respondent's existing and long-standing right to use such nurses as the Respondent deems appropriate. In light of this factual record, the General counsel's assertion that the Respondent has refused to bargain with the union must be dismissed.

The factual record also compels dismissal of the allegation that the Respondent failed to give the bargaining unit members either a wage increase or a holiday bonus in December, 2023

and January, 2024. As to the wages allegation, it was the Respondent who offered to increase wages and to bargain over the increase, if the union chose. It was the union who flatly ignored that offer and it is the union that bears responsibility for the fact that no increase was granted. As to the holiday bonus allegation, it is true that no holiday bonus was granted but it is likewise true, and uncontested in the record here, that holiday bonuses were always discretionary and never promised to any employees. See tr. at 340. Thus, in the absence of bargaining, the Respondent was not allowed, as a matter of law, to grant them to this unit. Certainly, if the union had responded to the offer of a wage increase and had met to bargain at anytime between December, 2023, and June, 2024, the subject of holiday bonuses could have been put on the table, but no such bargaining occurred. Even when the parties met again in October, 2024, to resume bargaining, the union did not raise the issue. Based on this record, the allegation that the Respondent failed to grant a holiday bonus in December, 2023, must be dismissed.

Allegations that the Respondent unlawfully delayed providing information also lack merit and deserve dismissal. General Counsel first asserts that the Respondent unreasonably delayed sending requested information between May 9, 2023, and October 31, 2023. This delay was not, however, in any way unreasonable. When the union sent the first request, on May 9, 2023, the validity of the certification election was still being disputed and the status of the union was still being litigated. As a result, it was reasonable for the Respondent to delay sending information until those challenges were resolved, one way or the other. Of course, if the challenges had succeeded, the union would have had no right to request or receive any information. After the challenges ended on or about August 16, 2023, the Respondent provided the information on October 31, 2023, a period of seventy-six days. Thereafter, the parties communicated about meeting to bargain and the union admitted that it was not ready to meet or to bargain. Clearly, then, the delay in sending information was of no consequence since the union was unprepared to

20

use the information. Then, after the exchange on November 2, 2023, the union made no response until December 11, 2023 (a period of thirty-nine days), demonstrating that the union felt no urgency about either bargaining or getting information. Thus, any delay in providing information before that was of no consequence and certainly did not damage or interfere with the union's ability to bargain.

After December, 2023, of course, the union went entirely silent for more than six months, further demonstrating that it had no sense of urgency to continue the bargaining that had begun in December, 2023. When the union finally woke and requested additional information on June 27, 2024, it already had information it deemed necessary for the initial stages of bargaining. The only information it lacked was the updated supplemental request. Admittedly, there was a delay in responding to the updated information requests, but the Respondent cured that delay on October 3, 2024.

The General Counsel's final assertion related to information requests contends that the Respondent failed to provide information in connection with the Respondent's proposal, on November 1, 2024, that nurses be laid off. Contrary to the characterization by General Counsel, however, the Respondent has never refused to provide information related to this proposal, did provide information requested within one day of the request, and has always stood ready to meet with and bargain with the union over all issues, including the use of subcontracted nurses and layoff and recall procedures. What it is not willing to do is to abandon its long-established right to staff its programs using subcontracted nurses simply because the union now opposes how the Respondent has chosen to exercise that right. The union and its members worked side by side with subcontracted contract nurses for years before the union was certified and every day during the eighteen months since certification and acquiesced to the practice every day during those periods.

21

In its Complaint, General Counsel next alleges that the Respondent subcontracted for nurses and laid off bargaining unit members without giving the union an opportunity to bargain over the issues. Respondent has addressed this refusal to bargain allegation previously and demonstrated, based on the record, that when it announced the expanded use of subcontractor nurses and anticipated layoffs, it did so while present in a bargaining session, ready to discuss the proposal. That discussion, and bargaining, would have occurred if the union had not abruptly terminated the session and refused any further meeting or discussion. The record simply does not support the contention that the Respondent refused to bargain. On the contrary, Board decisions confirm the correctness of the Respondent's actions here. Those decisions, including most recently the board's decision in Wendt Corporation, 372 NLRB No. 135, confirmed that an employer may continue an existing practice if that practice has occurred with sufficient regularity and frequency such that there can be no genuine dispute, "that employees could reasonably expect the practice to reoccur on a consistent basis as a term and condition of employment." Id. at 7.[1] In Wendt, the Board noted that an employer could satisfy the regular and frequent requirement if it could show that a particular practice occurred only as often as once a year over the course of a significant period of years. Id. Certainly here, the Respondent easily satisfies this requirement by continuing a practice (filling as many nursing shifts as it needed through subcontracting) that occurred every single day over the course of nearly a decade, including every day of the eighteen months following certification of the union as bargaining agent. Simply put, "There can be no dispute . . . that employees could reasonably expect the practice to reoccur on a consistent basis as a term and condition of their employment." Id. the factual record here, and under the law, it is clear that the Respondent was at all times permitted to continue its

---

[1] The opinion in Wendt also discusses, without much helpful guidance, that the exercise of an asserted existing practice may not be subject to great discretion on the part of the employer. Certainly, in this matter, the requirement of filling nursing shifts is not discretionary, it is fundamental to the licensure and operation of the Respondent's programs. Thus, the discretion aspect of the Wendt reasoning has no application here.

practice of using subcontracted nurses to fill shifts and that it was not required, by the facts or the law, to abandon that practice simply because the union decided one day that it disliked the practice. As this case now stands, the subject of future subcontracting can be bargained for, but the union may not insist that the practice cease in the absence of such bargaining.

Finally, General Counsel contends that the Respondent chose to subcontract for nurses and implemented layoffs because the employees joined a union. This is flatly contradicted by the record here. What that record actually shows is that the decisions were driven by the fact that: 1. the programs in Philadelphia operated at a substantial deficit in 2023; 2. the Respondent received permission to use LPNs, who were less expensive and who were not included in the bargaining unit; and, 3. the Respondent had succeeded in renegotiating its subcontractor agreements to significantly lower the rates for nurses. By examining the economic implications of these circumstances, the Respondent calculated that it could achieve savings between $102,000 and $276,000 EVERY YEAR by increasing its use of subcontracted nurses. The decision to do so was motivated by a need to save money and erase a deficient, pure and simple.

Notably, General Counsel has failed to produce even a shred of evidence to the contrary. The single circumstantial factor it could cite is the timing of the decision, which occurred while bargaining was underway. However, the fact that bargaining was still underway on November, 2024, is due, almost entirely, to the fact that the union ignored its obligation to bargain for more than six full months between December, 2023, and the last days of June, 2024. If the union had accepted the Respondent's invitation to bargain in earnest beginning in December, 2023, bargaining may well have ended well before November 1, 2024. If the Respondent had been motivated by anti-union animus in its decision-making, it could have used the fact that, by June 27, 2024, more than one year had passed since its certification with no bargaining other than the Respondent's offer of an unconditioned wage increase in December, 2023, six months earlier.

Rather than use this fact to challenge the union and its status as bargaining agent, the Respondent waived the issue so that bargaining could occur. Thus, rather than acting out of any animus, the Respondent acted to at all times fulfill its duty to meet and bargain in good faith. General Counsel's allegations to the contrary should be dismissed.

Respectfully submitted,


/s/Guy Vilim
Guy Vilim, Esq.
Atty. ID no. 42633
The Law Office of Guy Vilim, LLC
11 South Olive Street, 2nd Floor
Media, PA 19063
(610)-566-0711
gvilim@vilimlaw.com


**CERTIFICATE OF SERVICE**

24

I, Guy Vilim, hereby certify that a true and correct copy of:

### RESPONDENT'S POST HEARING BRIEF

was served on the following person on this 25th day of June 2025, through the NLRB's electronic filing system and via electronic email:

Lea Alvo-Sadiky
The Wanamaker Building
100 Penn Square East, Suite 403
Philadelphia, PA 19107
(215)-597-7630
lea.alvo-sadiky@nlrb.gov

Kathleen Bichner
325 Chestnut Street, Suite 600
Philadelphia, PA 19106
(215)-629-4970
KBichner@odonoghuelaw.com

Respectfully submitted,

/s/Guy Vilim
Guy Vilim, Esq.
Atty. ID no. 42633
The Law Office of Guy Vilim, LLC
11 South Olive Street, 2nd Floor
Media, PA 19063
(610)-566-0711
gvilim@vilimlaw.com

25