UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KIMBERLY E. ANDREWS, Regional Director of the Fourth Region of the NATIONAL LABOR RELATIONS BOARD, for and on behalf of the NATIONAL LABOR RELATIONS BOARD,<br><br>                    Petitioner,<br>          v.<br><br>NEW VITAE, INC. d/b/a NEW VITAE., WELLNESS AND RECOVERY<br><br>                    Respondent. | Civil No. 2:25-cv-04515 HB |

### PETITIONER'S REPLY BRIEF TO RESPONDENT'S RESPONSE TO THE PETITION FOR TEMPORARY INJUNCTION UNDER SECTION 10(j) OF THE NATIONAL LABOR RELATIONS ACT

Petitioner files this Reply to Respondent New Vitae, Inc. d/b/a New Vitae Health and Wellness's Memorandum of Law in Support of its Response to the Petition for an injunction under Section 10(j) of the National Labor Relations Act (the Act or NLRA) to correct Respondent's factual misrepresentations concerning its decision to lay off the entire bargaining unit and subcontract all bargaining unit work to agency nurses and to respond to Respondent's argument concerning the need for a temporary injunction.

Contrary to Respondent, the record shows that it was Respondent who failed to bargain about the decision to lay off the entire bargaining unit and to subcontract the work to agency nurses and not District 1199C, National Union of Hospital and Health Care Employees, AFSCME, AFL-CIO (the Union).[1] Indeed, the Union requested that Respondent bargain with it

---

[1] Respondent's counsel's characterization on page 2 of its Memorandum in Response that the Regional Director "[u]nfortunately, and improperly…cooperated with [the Union's] circumvention of [its] bargaining obligation up to an including the filing of instant Petition" and

on multiple occasions. Respondent only offered to bargain over the effects of its decision. Notably, Respondent cursory description of events do not cite to the record to show that it had in fact offered to bargain over the decision at any point. Indeed, as shown below, the record shows otherwise.

On November 1, 2024, when the parties met for their second bargaining session, Respondent announced to the Union that it had made the decision to "go contract" and that it would be laying off the entire bargaining unit later that day. (T. 110, 186-187, 191, 202)[2] Respondent provided the Union with a document titled "Employer Proposal," which stated: "Effective 7:00 p.m., November 1st, all full-time and part-time and per-diem nurses will be laid off and their employment will be ended."[3] The document included severance terms and information about employee healthcare, which Respondent said it was open to bargaining about. (T. 110, 187-188, 300; GCX 12) Prior to this meeting, Respondent did not inform the Union about any plans to lay off bargaining unit employees or to subcontract their work. (T. 191)

Contrary to Respondent, the Union did respond on numerous occasions seeking to bargain over the decision and not just the effects. While caucusing to discuss Respondent's proposal, Union counsel emailed Respondent's counsel that Respondent was required to bargain over its decision to subcontract bargaining unit work and requested copies of subcontracts with

---

its characterization on page 4 that "the union decided that it could have the Regional Director circumvent the bargaining structure mandated by the NLRA, up to and including coming to this Court…" are both inflammatory and offensive. The National Labor Relations Board is a neutral agency and does not side with any party. Contrary to Respondent's offensive insinuations, it is Respondent's egregious and serious violations of the Act, which circumvent the requirements of the Act and warrant the injunctive relief requested, not the Regional Director's actions.

[2] Factual citations are from the official administrative hearing record developed in Board Case No. 04-CA-324629 et al. "T. _" refers to the administrative hearing transcript, followed by the page(s) number(s) being cited. GCX __ and RX __ refers to Petitioner's and Respondent's exhibits respectively in the administrative record.

[3] It is undisputed that supervising nurses and other non-union staff were not included in the layoffs.

the different agencies Respondent was using to replace bargaining unit employees. (T.189; GCX 14(a), p. 5)

After caucusing, the Union bargaining committee again demanded bargaining over Respondent's decision to subcontract, as a mandatory subject of bargaining. Union counsel informed Respondent that it was not appropriate to bargain over the effects when the parties had not bargained over the decision to subcontract. (T. 190) At no time did Respondent offer to bargain over the decision itself.

Then on November 3, 2024, when Respondent texted bargaining unit employees, without bargaining with the Union, that they were being laid off and replaced by agency nurses, the text stated, in pertinent part:

> This is to inform you that New Vitae plans to use only contract nurses and that all staff nurses will be laid off. The details of that process have not been made final as we work out details with the Union. We are obliged by law to bargain with the union *over how layoffs will occur* and we made a proposal that the Union has in its hands. (GCX 36, emphasis added)

Notably, Respondent only referred to its obligation to bargain over the effects, it did not address its obligation to bargain over the decision to lay off the bargaining unit employees and subcontract their work.

In the subsequent days and weeks, Respondent failed to respond to the Union's repeated questions about Respondent's reasons for subcontracting, which is also part of the bargaining obligation and to the Union's demand that Respondent bargain over the decision to lay off bargaining unit employees and subcontract the entire work to agency nurses.[4] (T. 192; GCX

---

[4] It was only at the hearing before the administrative law judge that Respondent provided a reason for its decision to lay off bargaining unit employees and subcontract their work—that it believed it could save on labor costs by using staffing agencies instead of bargaining unit employees. As noted in Petitioner's Memorandum of Points and Authorities (PMPA), p. 34, a decision motivated by labor costs is one amenable to bargaining. *Furniture Renters of America*, 36 F.3d 1240, 1247 (3d Cir. 1994). However, Respondent unlawfully refused to provide a reason

14(a), p.3, GCX 15, p. 2; GCX 16) On November 2, 2024, in response to the Union's demand to bargain over the subcontracting of work, Respondent replied that it "has always contracted for nurses at the RTFA's in Philadelphia. There is no change in that." (GCX 14(a), p.4) On November 4, 2024, by email at 12:55 p.m., Respondent stated that its

> decision to utilize contract agencies to staff its programs is consistent with its practice since before the Union was certified and represents an exercise of its lawful right to manage and staff its programs as it chooses. We do not disagree that the issue of subcontracting is a legitimate subject of bargaining and New Vitae will honor its obligation to bargain in good faith on the issue looking *into the future*, but New Vitae does not agree that it must abandon it rights while bargaining occurs." (GCX 15, p. 3) (emphasis added)

That same day, by email at 2:34 p.m., Respondent stated that it was "willing bargain over the use of contract employees *in the future* as part of overall bargaining but we are not obliged to state with the Union all of the Employer's thoughts or reasonings. … We have a practice that we are comfortable with and propose no change in that established practice." (Emphasis added.) Respondent added that it agreed "to delay the effective date and time of layoffs pending good faith negotiations *over the terms of those layoffs*." (T. 192-193; GCX 14(a)) (emphasis added) Again and again Respondent only offered to bargain over the effects of its decision and not the

---

and to bargain over its decision to lay off bargaining unit employees and to subcontract their work. Armed with the information that Respondent was basing its decision on cost, the Union could have potentially bargained over costs and reached a satisfactory result. In addition to Respondent's refusal to bargain over the decision, Respondent's failure to provide the information was also a failure to bargain in good faith. See e.g., *Hendrickson Trucking Co.*, 365 NLRB No. 139 (2017), enfd. 770 Fed. Appx. 1 (D.C. Cir. 2019) (failure to respond to the union's requests was evidence that the employer did not bargain in good faith to a valid impasse); *E. I. du Pont & Co.*, 346 NLRB 553, 558 (2006), enfd. 489 F.3d 1310 (D.C. Cir. 2007) (Such a situation arises when a party's failure to provide requested information *necessary* for the other party to create counterproposals and therefore to engage in meaningful negotiation will preclude a lawful impasse); *Decker Coal Co.*, 301 NLRB 729, 740 (1991) ("A failure to supply information relevant and necessary to bargain constitutes a failure to bargain in good faith in violation of Section 8(a)(5), and no genuine impasse could be reached in these circumstances.") Furthermore, contrary to Respondent's claim in footnote 2, Respondent's labor cost analysis is not uncontested, and, in fact, Respondent's cost savings came not from the use of agency nurses but from the additional use of LPNs who cost significantly less than RNs. See PMPA pp. 39-40.

decision itself, claiming consistently that it had the right to contract out all the work.

Respondent's email, dated January 28, 2025, blaming the Union for terminating bargaining while indicating that it was willing to bargain does not warrant a different conclusion. (GCX 16, p. 2) When the Union responded back on February 3, 2025, reiterating that it was premature to engage in effects bargaining because Respondent had not yet bargained with the Union over its decision to subcontract and to lay off the entire bargaining unit and failed to provide a reason for these decisions, Respondent failed to respond back. (T. 194; GCX 16) Indeed, if Respondent truly was willing to bargain as it claims, it could have provided the information that the Union was seeking and made clear that it was willing to bargain, not just over the effects of the decision, but over the decision itself.

Respondent defends its actions on its failure to bargain over the decision to lay off bargaining unit employees and replace them with agency nurses on its past use of agency nurses to fill available slots.[5] In its post-hearing brief at p. 22, Respondent cites to *Wendt Corp.*, 372 NLRB No. 135 (2023) as precedent for its assertion that the occasional use of an agency nurse to fill-in for a bargaining unit employee means that it does not have to bargain over the wholesale subcontracting of a type of work formerly done by the bargaining unit. As noted previously, see PMPA page 33, this argument fails. Moreover, in cases similar to this one, the Board has found that an employer must bargain when it substantially increases or expands the use of contractors to perform bargaining unit work even if it had subcontracted to some degree in the past. See *Cascades Containerboard Packaging--Niagara*, 370 NLRB No. 76 (2021); *O.G.S. Technologies, Inc.*, 356 NLRB 642, 644-647 (2011) (finding that the employer had a duty to bargain over marginal increase in subcontracting its die-cutting work, from 85 percent to 100 percent).

---

[5] The fact that Respondent may have filled some shifts entirely with agency nurses prior to November 1, 2024 is not evidence of a past practice that it filled all the shifts with agency nurses.

5

Respondent's subcontracting of all the bargaining unit work was a substantial expansion of its use of agency nurses, and not, as the Respondent argues, consistent with its past practice of using outside contractors to perform a portion of that work. See *Cascades Containerboard Packaging-- Niagara*, supra.

Similarly, Respondent misrepresents when it laid off bargaining unit employees. Respondent's protestations that it did not actually lay off employees until November 7, 2024, is without merit, as none of the bargaining unit employees were allowed to work for Respondent after November 1, 2024.[6] The record evidence shows that on November 1, 2024, Respondent's proposal notified the Union that it was laying off employees that day. And, on the evening of November 1, 2024, Respondent no longer allowed bargaining unit employees to work. (T. 111-112) Then, on November 3, 2024, Respondent texted bargaining unit employees letting them know that they were being laid off and replaced by agency nurses. (T. 112, 113-114; 195, 196-197, 322; GCX 36) "To be timely, the notice must be given sufficiently in advance of actual implementation of the change to allow a reasonable opportunity to bargain."[7] At a minimum this means that an employer must "inform the union of its proposed actions under circumstances which afford a reasonable opportunity for counter arguments or proposals."[8] Here the Respondent gave the Union no warning that a layoff was in the works until November 1, 2024 and then implemented that layoff the same day. Moreover, the record fails to explain why the layoff had to be implemented so hastily, Respondent's assertions of "security reasons" in its text

---

[6] Respondent's argument that it did not actually lay off employees until November 7, 2024, seems to be based on its November 3, 2024 text which informed employees that they were being laid off and replaced by agency nurses but insisted that they were not laid off as of that date but would no longer be working due to some unspecified "security concerns." (GCX 36) Respondent has not justified what security reasons caused it to lay off all employees

[7] *Ciba-Geigy Pharmaceutical Division*, 264 NLRB 1013, 1017 (1982), enfd. 722 F.2d 1120 (3d Cir. 1983).

to employees notwithstanding. Although it could have easily suspended the layoff until it complied with its obligation to bargain over both the decision and its effects, Respondent instead made a calculated decision to not comply with its bargaining obligation. Based on the above, Petitioner has met the burden of showing that it will likely succeed on the merits of the allegations that Respondent violated Sec. 8(a)(5) and (1) by failing to give the Union sufficient notice and opportunity to bargain before implementing the layoff and presenting the layoff and subcontracting of unit work as a fait accompli.[9]

Respondent further argues that Petitioner has not met the equitable criteria to establish that a temporary injunction is required here to protect the Union's and employees' statutory rights in the public interest and preserve the remedial authority of the Board. This is palpably wrong. See PMPA pp. 40-51. Specifically, Respondent argues that granting the relief requested by the Petitioner would have a devasting effect on Respondent's ability to continue providing its services because it would not be able to cover shifts using agency nurses. This is simply not true. Petitioner is only seeking to restore the status quo ante as it existed prior to November 1, 2024 before Respondent unlawfully and unilaterally laid off the entire bargaining unit and subcontracted *all* bargaining unit work to agency nurses.[10] Thus, to any lawful extent that Respondent is unable to fill shifts with bargaining unit employees, the interim relief requested by Petitioner, would not enjoin Respondent from using agency nurses as it did prior to November 1, 2024. Respondent is correct that ultimately the decision on how to use agency nurses when there

---

[8] *Pontiac Osteopathic Hospital*, 336 NLRB 1021, 1023 (2001), quoting *NLRB v. Citizens Hotel Co.*, 326 F.2d 501, 505 (5th Cir. 1964).
[9] For the reasons stated in PMPA pp. 35-39, Petitioner is also likely to succeed on the merits, by a clear preponderance of the evidence, that Respondent would not have laid off bargaining unit employees and subcontracted their work absent their union activity, in violation of Section 8(a)(3) of the Act.
[10] *Pascarell v. Vibra Screw,* 904 F.2d at 878, n.5; *Hirsch v. Trim Lean Meat Products,* 479 F. Supp. 1351, 1357 (D. Del. 1979).

are not enough of its own employees to cover shifts is best determined through bargaining with the Union.[11] However, Respondent short circuited any attempt to bargain by its unlawful effort to permanently remove Union supporters from its workforce. It is, therefore, appropriate for the Court to grant relief designed to reverse the effects of the unfair labor practices which have taken place.[12] The interim relief requested by Petitioner, including interim reinstatement of bargaining unit employees, restoration of the unit work, and bargaining over unilateral changes is necessary to prevent irreparable harm to the Union's ability to effectively represent employees. Without such an immediate temporary injunction, Respondent will succeed through its illegal conduct in permanently depriving its employees of the Union representation they desired, contrary to the Act's intent.

For the reasons stated here and in the PMPA, Petitioner urges the Court to prevent irreparable harm, preserve the public interest inherent in employee free choice, and ensure the

---

[11] It is rather rich of Respondent to assert that it will be deprived of the opportunity to complete the bargaining process if the temporary injunction is granted, when its own actions have effectively destroyed the collective bargaining process and deprived employees of the benefits of representation by the Union. Section 10(j) interim relief prevents "employers from using unfair labor practices in the short run to permanently destroy employee interest in collective bargaining." *Pye v. Excel Case Ready*, 238 F.3d 69, 74-75 (1st Cir. 2001). Furthermore, that assertion is clearly incorrect. The requirement to restore the status quo ante will allow both parties to continue bargaining for a first contract. It will just do so without jeopardizing the integrity of the bargaining process.

[12] The Third Circuit limits the duration of any Section 10(j) injunction pending the issuance of the Administrative Law Judge's (ALJ) decision and, thereafter, pending the final Board decision and order. In the Third Circuit, Section 10(j) injunctive relief is to be effective for a period of time not to exceed six months, and the petitioner may, upon motion, request a thirty day extension if it appears that the decision of the Board's ALJ in the underlying unfair labor practice complaint is imminent, and after the issuance of said ALJ's decision, upon further motion of the petitioner, may be extended, pending the Board's final decision, for an additional period of time, not to exceed six months from the date of the ALJ's decision, and that the petitioner may, upon further motion, request an additional thirty day extension, if it appears that the Board's final decision on the underlying unfair labor practice complaint is imminent See *Eisenberg v. Hartz Mountain Corporation*, 519 F.2d 138, 144 (3d Cir. 1975), reaffirmed in *Eisenberg v. Holland Rantos Co., Inc.*, 583 F.2d 100, 103-04 (3d Cir. 1978)

integrity of the Board's remedial authority by entering an injunction to reinstate the bargaining unit employees, restore unit work, and require Respondent to bargain in good faith with the Union, in addition to other appropriate relief, as requested in the Petition.

Dated at Philadelphia, Pennsylvania, this 19th day of September 2025.

Respectfully submitted,

_s/Lea F. Alvo-Sadiky_____
LEA F. ALVO-SADIKY
Attorney for the Petitioner
National Labor Relations Board, Region Four
The Wanamaker Building
100 East Penn Square, Suite 403
Philadelphia, Pennsylvania 19107
Telephone: 215-597-7630
Fax (215) 597-7658
lea.alvo-sadiky@nlrb.gov
Attorney I.D. PA 92378

## **CERTIFICATE OF SERVICE**

      I hereby certify that copies of the Petitioner's Reply Brief to Respondent's Response to the Petition for Temporary Injunction Under Section 10(j) of the National Labor Relations Act were served on counsel listed below on September 19, 2025 via electronic mail and through the Court's efiling system:

| | |
|---|---|
| Guy Vilim, Esquire<br>The Law Office of Guy Vilim<br>11 South Olive Street, 2nd Floor<br>Media, PA 19063<br>gvilim@vilimlaw.com | Noreen Amir, Esquire<br>The Law Office of Guy Vilim<br>11 South Olive Street, 2nd Floor<br>Media, PA 19063<br>namir@vilimlaw.com |

      Respectfully submitted,

      _s/Lea F. Alvo-Sadiky_
      LEA F. ALVO-SADIKY
      Attorney for the Petitioner
      National Labor Relations Board, Region Four
      The Wanamaker Building
      100 East Penn Square, Suite 403
      Philadelphia, Pennsylvania 19107
      Telephone: 215-597-7630
      Fax (215) 597-7658
      lea.alvo-sadiky@nlrb.gov
      Attorney I.D. PA 92378